1
2
3
4
5

Jason Harrow
(Cal. Bar No. 308560)
GERSTEIN HARROW LLP
3243B S. La Cienega Blvd.
Los Angeles, CA 90016
jason@gerstein-harrow.com
(323) 744-5293

James Crooks
(*pro hac vice*)
Michael Lieberman
(*pro hac vice*)
FAIRMARK PARTNERS, LLP
1825 7th Street NW, #821
Washington, DC 20001
jamie@fairmarklaw.com
(619) 507-4182

6
7
8
9
10
11

Charles Gerstein
(*pro hac vice*)
Emily Gerrick
(*pro hac vice*)
GERSTEIN HARROW LLP
810 7th Street NE, Suite 301
Washington, DC 20002
charlie@gerstein-harrow.com
(202) 670-4809

12

### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

AMANDA HOUGHTON, CHARLES DOUGLAS, and SUSAN FRANKLIN, on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

COMPOUND DAO, a California general partnership; ROBERT LESHNER; GEOFFREY HAYES; AH CAPITAL MANAGEMENT, LLC; POLYCHAIN ALCHEMY, LLC; BAIN CAPITAL VENTURES (GP), LLC; GAUNTLET NETWORKS, INC; PARADIGM OPERATIONS LP,

Defendants.

Case No. 22-cv-7781-WHO

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS**

**CLASS ACTION**

**JURY TRIAL DEMANDED**

**Date: August 16, 2023**
**Time: 2:00 PM**
**Courtroom 2**
**Before the Hon. William H. Orrick**

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ................................................................ 1

II.    FACTUAL BACKGROUND ................................................................... 2

III.   LEGAL STANDARD ............................................................................ 7

IV.    ARGUMENT ........................................................................................ 7

       A.    Compound Is a Statutory Seller ................................................... 8

             1.     The Legal Standard for Solicitation Encompasses A Broad Array
                    Of Promotional Statements And Activities. ................................ 9

             2.     Compound Solicited Plaintiffs' Purchases. ................................ 11

                    a.    The Compound Partnership Actively and Repeatedly
                          Encouraged People To Buy COMP. ................................ 11

                    b.    Defendants Were Motivated by Financial Gain. ............. 19

                    c.    Plaintiffs Need Not Allege That They Relied On Any
                          Specific Solicitation. ........................................................ 20

       B.    Defendants Sold COMP Tokens. ................................................. 21

       C.    Plaintiffs' Claims Are Timely. .................................................... 22

V.     CONCLUSION .................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Binance*,
  2022 WL 976824 (S.D.N.Y. March 31, 2022) ........................................................ 24

*Capri v. Murphy*,
  856 F.2d 473 (2d Cir. 1988) ................................................................ 14, 20

*City of Pontiac Gen. Employees' Ret. Sys. v. MBIA*, Inc.,
  637 F.3d 169 (2d Cir. 2011) ................................................................. 24

*Davy v. Paragon Coin, Inc.*,
  2021 WL 2940200 (N.D. Cal. Mar. 26, 2021).................................................... 10, 14

*Disability Rts. Montana, Inc. v. Batista*,
  930 F.3d 1090 (9th Cir. 2019)................................................................... 7

*Diskin v. Lomasney & Co.*,
  452 F.2d 871 (2d Cir. 1971). ................................................................... 24

*In re Charles Schwab Corp. Sec. Litig.*,
  257 F.R.D. 534 (N.D. Cal. 2009) ............................................................... 14

*In re Longfin Corp. Sec. Class Action Litig.*,
  2019 WL 1569792 (S.D.N.Y. Apr. 11, 2019) .................................................... 20

*In re Med. Cap. Sec. Litig.*,
  2010 WL 11508331 (C.D. Cal. Aug. 11, 2010) .................................................. 23

*In re Portal Software, Inc. Sec. Litig.*,
  2006 WL 2385250 (N.D. Cal. Aug. 17, 2006) .................................................. 14

*In re Tezos Securities Litig.*,
  2018 WL 4293341 (N.D. Cal. Aug. 7, 2018)........................................... 10, 12, 13, 21

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)............................................................................. 7

*Pino v. Cardone Capital, LLC*,
  55 F.4th 1253 (9th Cir. 2022) ......................................................... 9, 15, 20, 21

*Pinter v. Dahl*,
  486 U.S. 622 (1988)................................................ 7, 8, 9, 10, 11, 13, 19, 21, 23

*Pirani v. Slack Techs., Inc.*,
  445 F. Supp. 3d 367 (N.D. Cal. 2020) ................................................ 7, 10, 11, 14, 19

*Primo v. Pac. Biosciences of Cal., Inc.*,
  940 F. Supp. 2d 1105 (N.D. Cal. 2013) ...................................................... 11

*SEC v. Phan*,
  500 F.3d 895 (9th Cir. 2007)................................................................. 22

*SEC v. Sierra Brokerage Servs., Inc.,*
    608 F. Supp. 2d 923 (S.D. Ohio 2009) ............................................................. 17, 22

*Smolen v. Deloitte, Haskins & Sells,*
    921 F.2d 959 (9th Cir. 1990) .......................................................................... 20

*Toombs v. Leone,*
    777 F.2d 465 (9th Cir. 1985) ...................................................................... 23, 24

*Wildes v. BitConnect Int'l PLC,*
    25 F.4th 1341 (11th Cir. 2022) .................................................................. 10, 14

*Zakinov v. Ripple Labs,*
    2020 WL 922815 (N.D. Cal. Feb. 26, 2020) ..................................................... 24

**Statutes**

15 U.S.C. § 77aa ............................................................................................. 8

15 U.S.C. § 77b ........................................................................................... 9, 17

15 U.S.C. § 77d ............................................................................................. 8

15 U.S.C. § 77e ........................................................................................... 7, 8

15 U.S.C. § 77g ............................................................................................. 8

15 U.S.C. § 77*l* ........................................................................................... 9, 23

15 U.S.C. § 77m ........................................................................................... 23

**Other Authorities**

Complaint, *SEC v. Coinbase, Inc.,*
    No. 23-cv-4738 (S.D.N.Y. filed June 6, 2023) .................................................. 2

*In the Matter of Cap. Gen. Corp.,*
    Release No. 7008 (SEC July 23, 1993) ............................................................ 22

**Treatises**

THOMAS LEE HAZEN,
    LAW OF SECURITIES REGULATION (6th ed. 2009) ............................................. 22

**Rules**

17 C.F.R. § 230.168 ................................................................................... 18, 19

17 C.F.R. § 230.169 ................................................................................... 18, 19

**PLAINTIFFS' RESPONSE TO MOTION TO DISMISS**

1

## I.   PRELIMINARY STATEMENT

Defendant Compound DAO ("Compound") operates a business allowing users to borrow and lend crypto assets, in much the same way that a traditional bank allows customers to borrow and lend traditional assets. Like a traditional bank, Compound earns money on the spread between the rate borrowers pay and the rate lenders earn. And like a traditional bank, it issued equity shares, called COMP tokens, and made those tokens widely available for trading by the general public. The market capitalization of those tokens was, at its peak, approximately $4 billion. Compound's partners, also defendants here, collectively held COMP tokens worth approximately $2 billion. Defendants do not contest that COMP tokens are securities. Defendants do not contest that COMP tokens are *unregistered* securities. And Defendants do not contest that selling unregistered securities violates the securities laws.

Defendants instead argue for dismissal on the ground that they are not "sellers" of COMP securities. To do this, they misconstrue the legal standard and ignore the facts. Defendants are liable for selling unregistered securities not only if they pass title to securities, but also if they "solicit" their sale—a standard that the Ninth Circuit has described as "broad." Here, Compound orchestrated and executed a comprehensive plan to solicit the investing public to purchase COMP. Compound issued the COMP security, designed COMP to function as an investment, distributed COMP to users of its product to create a market for COMP, and then convinced multiple third-party crypto exchanges to list COMP for the investing public to buy and sell. Compound bought advertisements on at least one of those exchanges, paying Coinbase to advertise COMP tokens for purchase. On top of that, Compound's partners repeatedly urged the public to participate in "governance" of the Compound protocol, which can in practice be accomplished only by buying COMP tokens. All the while, Compound's partners regularly touted Compound's business prospects, which, in this context, is the same thing as touting COMP as an investment: Because of a

design strategy Defendants called "recursive leverage," using Compound's bank always results in a purchase of Compound's securities.

Every step of this plan was choreographed. Compound did not stumble backwards into a $4 billion market cap. The partner defendants did not stockpile millions of COMP tokens as a curiosity. They all simply proceeded on the belief, or hope, that the novelty of crypto would allow them to make vast sums money selling COMP tokens while sidestepping the disclosure regime Congress established to help investors make informed investment decisions—disclosures that surely would have warned about, *e.g.*, the existential risks facing the crypto industry. *See, e.g.*, Complaint, *SEC v. Coinbase, Inc.*, No. 23-cv-4738 (S.D.N.Y. filed June 6, 2023) (alleging that the largest crypto asset trading platform in the United States is violating multiple securities laws).

But the same rules apply in crypto as everywhere else. Indeed, two pillars of Compound's ostensible legal strategy have already crumbled. In line with recent court decisions and regulatory action, Defendants do not deny that they formed a general partnership and do not deny that the COMP token is an unregistered security. Their only remaining argument is that their partnership is not responsible for causing people to buy their unregistered securities: that, in essence, they were just running a savings-and-loan business, and—lo and behold—$4 billion in securities somehow issued, promoted, and sold themselves. Although the crypto details make Defendants' scheme seem novel, application of long-settled securities-law principles, as well as Supreme Court and Ninth Circuit case law, dispose of all of their arguments. The Court should deny Defendants' motion.

## II.   FACTUAL BACKGROUND

In 2017, a company called Compound Labs created a protocol on the Ethereum blockchain called the Compound protocol. (ECF No. 76, First Amended Complaint (FAC) ¶ 30; *see id.* ¶¶ 22-28 (providing background on crypto terminology).) The

Compound protocol creates a savings-and-loan business. (*Id.*) Through the Compound protocol, users can "lock" (essentially deposit) crypto assets into a "pool" from which other users can borrow after posting sufficient collateral. (*Id.*) The spread between the rate borrowers pay and the rate lenders earn is collected and controlled by whomever controls the Compound protocol. (*Id.* ¶ 32.)

On February 26, 2020, Defendant Robert Leshner announced that he was beginning the process of transferring the Compound business from Compound Labs to the soon-to-be-formed Compound partnership ("Compound," unmodified). (*Id.* ¶ 39.) To facilitate this transition, Leshner and Compound Labs created a crypto token called COMP. (*Id.* ¶¶ 40, 43.) Although Leshner described COMP as a "governance token" (*id.* ¶ 40) and touted investors' ability to use the token to control the business, the plan was always to ensure that insiders kept control of the business into the distant future: When COMP was first issued, Compound Labs released a planned "supply schedule" according to which "founders and team," "shareholders," and "future team members" will together hold 57.8% of the outstanding COMP supply when COMP is fully distributed. (*Id.* ¶ 47.)

Thus, as Compound concedes for this motion, COMP was actually a revenue-raising device. And Compound used COMP to make money in an innovative way: Compound distributed COMP to borrowers and lenders in proportion to the amount that they borrowed and loaned. (*Id.* ¶ 52.) This is an example of a strategy called "yield farming" or "liquidity mining," which Compound essentially pioneered. (*Id.* ¶ 53.) By providing COMP tokens proportionally to deposited and borrowed assets—and, therefore, proportionally to the fees users pay—the protocol creates incentives for users to deposit or borrow funds, and to pay fees. (*Id.*) This innovative strategy relied on something Defendant Gauntlet Networks, Inc., called "recursive leverage." (*Id.* ¶ 61.) COMP tokens represent a claim on Compound's future earnings. (*Id.* ¶ 32 ("As Salil Deshpande, a managing director at [Defendant] Bain [Capital Ventures

**PLAINTIFFS' RESPONSE TO MOTION TO DISMISS**

GP] put it, '[t]he owners of the protocol . . . collect a protocol-defined commission on each outstanding loan.'".) The more users borrow and lend with Compound, the more COMP they are rewarded with, which creates an incentive to borrow and lend more, which creates more value for the Compound business and the COMP tokens that represent a claim on the earnings of that business, which creates an incentive to borrow and lend more, and so on *ad infinitum*. Meanwhile, as COMP is spiraling upward in value because of recursive leverage, the Defendants hold most of it. (*E.g.*, *id.* ¶ 58.)

For this plan to work, Defendants needed a robust secondary market for COMP, for two reasons. First, if Compound borrowers and lenders could not reliably sell their COMP on the secondary market, the special incentive Compound created to borrow and lend would disappear. Second, if COMP were not reliably tradeable, the Partner Defendants' majority share of COMP would be effectively worthless. So, about two weeks after COMP's release to the public, Compound persuaded Coinbase, the largest U.S.-based crypto asset exchange, to list COMP for trading. (*Id.* ¶ 63.) According to Coinbase's website, one of the many benefits of listing an asset on Coinbase is "help[ing] new customers learn about your asset to help you reach and grow an audience." (*Id.* ¶ 67 (some alterations omitted).) After listing COMP on Coinbase, Compound arranged with and possibly paid Kraken, Robinhood, Uphold, Nexo, Binance, and KuCoin to list COMP tokens. (*Id.* ¶¶ 83, 85–86.) Until recently, COMP was also listed on FTX. (*Id.* ¶ 84.) FTX's CEO, Sam Bankman-Fried, touted COMP in a 20-tweet Twitter thread, noting that the value of COMP would be tied to the success of Compound's business. (*Id.*) Leshner also personally reached out to Arbitrum, a supposedly decentralized exchange, to list COMP in response to investor requests for more low-cost trading of COMP. (*Id.* ¶82.)

Compound's promotion of COMP did not end there: Leshner and other defendants arranged for Compound to participate in a program called "Coinbase

Earn." (*Id.* ¶ 70.) Through Coinbase Earn, Coinbase users were paid in COMP to watch a video promoting Compound. (*Id.*) Coinbase described the program as "a platform to engage with our users through videos and tasks where users can earn crypto assets that they learn about. We earn a commission based on the amount of crypto assets distributed to our users." Coinbase's website specifically invited users to "Earn $3 COMP" by watching a video; immediately listed the price, market capitalization, and recent market activity of COMP; and then invited users to click a link to "trade Compound." (*Id.* ¶ 71.) In other words, Compound paid the largest U.S.-based crypto exchange to advertise COMP to Coinbase investors. (*Id* ¶¶ 70–71.) And those investors, by definition, had absolutely no use for COMP other than speculative investment—users who hold "governance" assets through Coinbase generally cannot vote in any decentralized decision-making (*id.* ¶ 72), all of which is illusory here anyway, as explained above.

Meanwhile, Defendants extensively promoted COMP in public statements. (*Id.* ¶ 88.) The first method of promotion came in two steps. The first step was to tell the investing public that COMP holders had a claim to the profits of the Compound protocol. Defendant Andreesen Horowitz described COMP as "an instrument for effectively distributing the fundamental value of the Compound business, including a fee stream." (*Id.* ¶ 139 (alterations omitted).) Leshner explicitly compared COMP tokens to ownership shares in Nike. (*Id.* ¶ 154.) And Defendant Polychain described COMP as "an attempt to extract revenues from the Compound protocol." (*Id.* ¶ 141 (alterations omitted); *see also id.* ¶¶ 140–42, 147, 150-53.) The second step was to tell the investing public that the protocol would be successful—*i.e.*, that tokenholders would have plenty of "revenues" to "extract." For example, Leshner described the Compound protocol as a piece of "financial infrastructure that applications and developers can rely on, *forever*" (*id.* ¶ 43), and he touted the Compound protocol as "the most effective tool for borrowers in DeFi." (*Id.* ¶ 132.) Compound's paid

advertisement on Coinbase Earn similarly predicted that Compound would, "100 years from now," "be integrated into many applications around the globe, enabling entirely new products to come to life across a wide range of industries and use cases." (*Id.* ¶ 73.)

Defendants also touted the "governance" benefits of holding COMP. (*See id.* ¶¶ 43–ß47, 132.) Because these so-called "governance" benefits can be enjoyed only by owners of COMP,[1] any attempt to convince people to participate in governance is inherently an attempt to convince people to buy COMP. And in many cases, that is all it is. Leshner has explained that "a big design decision" for Compound was to enable investors to delegate their votes to someone else while holding COMP solely as a speculative investment, and openly acknowledged that "over time most token holders don't want to be in the business of voting." (*Id.* ¶ 147; *see id.* ¶ 148 ("In Leshner's view, most holders would be passive investors, trusting others to run the business, and treat the COMP tokens just like they would any other security.").) Moreover, investors on Coinbase—the very exchange on which Compound chose to run paid advertisements—are technologically unable to participate in governance. (*Id.* ¶¶ 72, 149.)

Defendants' various forms of solicitation were remarkably successful. In its first week, COMP's market capitalization increased fourfold, from $100 million to $400 million. (*Id.* ¶ 56.) In exchange for investing approximately $25 million in a series A funding round for Compound Labs, early investors were given 2,396,307 COMP tokens (thus paying $10.43 per token). (*Id.* ¶ 62.) At COMP's peak price, in May 2021, those tokens were worth $2,047,189,033, representing slightly less than a 1,000% (or "10x," in Silicon Valley lingo) return in less than two years. (*Id.*) Even

---

[1] Theoretically, one can participate in governance without owning COMP by receiving delegated votes. But this is not what Defendants were encouraging people to do. (*See, e.g.*, FAC ¶ 43 ("Participation in the DAO starts with the Compound governance token, COMP." (cleaned up)).)

**PLAINTIFFS' RESPONSE TO MOTION TO DISMISS**

today, that stake would be worth more than $68 million (as of June 18, 2023). Retail investors did not fare so well. Over the class period in this case, COMP investors have lost more than a billion dollars in value.

## III.   LEGAL STANDARD

To survive a motion to dismiss, a "plaintiff must provide a short and plain statement of the claim showing the pleader is entitled to relief which contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Disability Rts. Montana, Inc. v. Batista*, 930 F.3d 1090, 1096 (9th Cir. 2019 (alterations omitted)). All allegations must be construed "in the light most favorable to the nonmoving party." *Id.* The motion should be denied as long as the facts alleged, based on "reasonable inferences from that content," are "plausibly suggestive of a claim entitling the plaintiff to relief." *Id.*

Specifically as to this case, "whether or not defendants actually solicited plaintiffs' sales is a factual question which should generally be left to the jury; at this stage plaintiffs need only satisfy Rule 8(a)'s lenient pleading standards." *Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 384 (N.D. Cal. 2020), *rev'd on other grounds sub nom. Slack Techs., LLC v. Pirani*, 143 S. Ct. 1433 (2023).

## IV.   ARGUMENT

The Securities Act of 1933 protects investors by ensuring that companies issuing securities make a "full and fair disclosure of information" relevant to a public offering. *Pinter v. Dahl*, 486 U.S. 622, 646 (1988). "The linchpin of the Act is its registration requirement." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 178 (2015); *see* 15 U.S.C. § 77e (making it unlawful to sell a security "[u]nless a registration statement is in effect"). With limited exceptions not relevant here, an issuer may not offer securities to the public without filing a registration statement that contains sufficient truthful information to ensure that

the investing public can make an informed investment decision. *Omnicare*, 575 U.S. at 178; *see* 15 U.S.C. §§ 77d, 77e, 77g, 77aa.

Defendants do not dispute that they violated these requirements. They concede, for purposes of this motion at least, that they issued unregistered securities and made exactly zero of the mandated disclosures before offering those securities to the general public. They do not dispute that their unregistered securities have been bought and sold millions of times, and they do not dispute that they have made a very large amount of money (and the proposed class has lost a very large amount of money) as a result. Defendants' only argument for dismissal is, essentially, that they merely *watched* these sales happen instead of *making* them happen. That argument blinks reality. Defendants designed and executed a wildly successful plan to enable and encourage the general public to buy COMP, and they did so to serve their own financial interests. That makes them statutory sellers under the Securities Act, *see Pinter*, 486 U.S. at 647, and that makes them liable in this case.

In arguing to dismiss Plaintiffs' complaint, Defendants make three key mistakes. First, they contend that the only way to be liable for soliciting the purchase of unregistered securities is to say "you should buy these securities!". That is wrong; the standard is broad, and it sweeps in conduct just like Defendants'. Second, Defendants ignore that (among other things) they *did* say "you should buy these securities," in so many words at least: they paid to advertise COMP for sale, arranged to list it for secondary-market sale, and promoted it extensively. Third, Defendants mistake the statute of limitations governing the *claims* in this case for a statute based on their *conduct*. Plaintiffs' claims accrued when they purchased COMP, not when Defendants began promoting COMP, so the claims here are timely.

## A.   Compound Is a Statutory Seller.

Defendants cannot argue effectively that they never sold COMP to anyone—they somehow amassed two billion dollars in value for themselves, after all—and so

they principally argue that they did not sell COMP *to Plaintiffs* because Plaintiffs purchased COMP on secondary markets like Coinbase. This argument fails. To solicit the purchase of a security, defendants need do no more than urge another to purchase it for defendants' own financial gain. Defendants did that.

### 1. The Legal Standard for Solicitation Encompasses A Broad Array Of Promotional Statements And Activities.

Section 12(a)(1) of the Securities Act of 1933 imposes liability on "any person" who "offers or sells" an unregistered security. 15 U.S.C. § 77*l*(a)(1). Liability under this provision "is not limited to persons who pass title" to an unregistered security. *Pinter*, 486 U.S. at 647. Instead, the securities laws also impose seller liability on any person who "solicits the purchase" of an unregistered security, "motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id.*; *see also id.* at 643; 15 U.S.C. § 77b(a)(3) (defining "offer" and "sell"). Congress provided a cause of action against those who solicit the sale of unregistered securities, rather than only those who pass title, because "solicitation is the stage at which an investor is most likely to be injured, that is, by being persuaded to purchase securities without full and fair information." *Id.* at 646–47.

The test for "solicitation" is not demanding and encompasses all forms of enabling and encouraging securities purchases. Although liability does not extend to "collateral participants" like "accountants and lawyers, whose involvement is only the performance of their professional services," *id.* at 650–51 & n.26, the statute reaches all conduct "directed at producing the sale," *id* at 646. Courts have refused to graft any further limitations on the definition of solicitation, explaining that there is "no indication that Congress was concerned with regulating only a certain type of solicitations." *Pino v. Cardone Capital, LLC*, 55 F.4th 1253, 1259 (9th Cir. 2022). Most recently, the Ninth Circuit rejected an argument that "specifically targeted active and direct solicitations" are a *sine qua non* of statutory sales, holding instead that the

Act's "broad language" encompasses "indirect, mass communications to potential investors through social media posts and online videos." *Id.* at 1258. In short, the statutory test is indifferent to the form of a solicitation and captures all conduct "directed at producing the sale." *Pinter*, 486 U.S. at 646; *accord Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341, 1345 (11th Cir. 2022) (noting that the Securities Act "makes a person who solicits the purchase of an unregistered security liable for using '*any* means' of 'communication in interstate commerce.'" (emphasis in original)).

Applying these standards, courts in this district have held that defendants "solicit" through all manner of conduct directed at producing securities purchases. Contrary to Defendants' contention (at, *e.g.*, Mot. 10), these cases do not require explicit statements like "you should buy these securities!"; they instead encompass all types of involvement in enabling and encouraging securities sales. Consider the following recent cases from this District, which Defendants fail to discuss in any detail:

- In *Davy v. Paragon Coin, Inc.*, No. 18-CV-00671, 2021 WL 2940200 (N.D. Cal. Mar. 26, 2021), defendant Emelichev "participated in editing and commenting on [a] White Paper, sent [the CEO] a draft investor presentation," and participated in "general conversations using scripted materials" with customers. *Id.* at *8. He was determined to be a statutory seller.

- In *Pirani*, 445 F. Supp. 3d 367, the court held that certain defendants were sellers merely because they "signed the Offering Materials," *i.e.*, a registration statement and a prospectus. *Id.* at 384.

- In *In re Tezos Securities Litigation.*, No. 17-cv-06779, 2018 WL 4293341 (N.D. Cal. Aug. 7, 2018), a defendant was involved in "creation of the Tezos technology, establishment of a legal entity to monetize [its] interest in that technology, development of a platform to facilitate said

monetization, and minute-to-minute oversight of the monetization process itself." *Id.* at *9. This defendant was a statutory seller.

- In *Primo v. Pac. Biosciences of Cal., Inc.*, 940 F. Supp. 2d 1105 (N.D. Cal. 2013), defendants' participation included "the preparation of, and sign[ing], the purportedly misleading solicitation documents." *Id.* at 1126.[2] These defendants were statutory sellers.

Crucially, none of these cases—nor any of Defendants' authorities—require that defendants' soliciting statements specifically speak to the merits of the securities as investments or otherwise tout the promise of speculative returns. Instead, simply and straightforwardly, statements and actions aimed at getting people to buy securities are enough, as long as the defendants surpass the "collateral participant" threshold. *Pinter*, 486 U.S. at 650–51 & n.26.

### 2. Compound Solicited Plaintiffs' Purchases.

#### a. *The Compound Partnership Actively and Repeatedly Encouraged People To Buy COMP.*

Plaintiffs have met their minimal pleading burden to allege that Defendants solicited investors to purchase COMP. The Complaint alleges that Compound took extensive action aimed at encouraging investors to buy COMP on the secondary market. These actions fall into roughly five categories, each of which independently suffices for solicitation: First, Compound was comprehensively involved in every aspect of COMP's creation, design, and distribution. Second, Compound persuaded and paid several crypto exchanges—including Coinbase, where Plaintiffs made their purchases—to list COMP and thereby enable and encourage secondary market

---

[2] Some of these cases discuss solicitation in the context of claims for selling securities by means of a prospectus that includes a material misstatement. *See* 15 U.S.C. § 77*l*(a)(2). The standard for solicitation is the same. *See, e.g.*, *Pirani*, 445 F. Supp. 3d at 383 (applying test from *Pinter v. Dahl*).

trading of COMP. Third, Compound paid at least one exchange to distribute promotional videos to investors for the purpose of getting them to buy COMP. Fourth, Compound repeatedly urged investors to participate in Compound "governance," which can be accomplished only by buying COMP. Fifth, Compound actively promoted COMP through extensive public statements touting the Compound business while making clear that the COMP token represented a claim to revenues generated by that business. And because no Defendant disputes its status as a general partner in the Compound partnership, each Defendant is liable to Plaintiffs based on the partnership's solicitation activities.

*First*, Compound was responsible for every aspect of COMP's design, creation, and distribution to the general public. Compound created COMP, designed it to be tradeable as an investment asset, sold it to users of the Compound protocol to create a market for COMP, implemented a plan to monetize its interest in COMP, and operated the savings-and-loan business from which COMP derives its value. (FAC ¶¶ 39–62.) Compound was the key player in every possible respect, planning and executing every step necessary to bring COMP to market. These actions, standing alone, meet the test for solicitation. In *Tezos*, another judge of this Court held that plaintiffs adequately stated a claim against defendants for soliciting sales on similar allegations, namely, based on defendants' "creation of the Tezos technology, establishment of a legal entity to monetize [its] interest in that technology, development of a platform to facilitate said monetization, and minute-to-minute oversight of the monetization process." 2018 WL 4293341 at *9. Those actions, the court explained, "ris[e] well above the level of 'collateral participation.'" *Id.* Compound did all of those same things, and then some.

Defendants are mistaken in suggesting that imposing liability on this basis would resurrect the "substantial factor" test that the Supreme Court rejected in *Pinter v. Dahl*, which held that "mere participation in unlawful sales" does not create

**PLAINTIFFS' RESPONSE TO MOTION TO DISMISS**

liability. (*See* Mot. 10:3–8 (quoting *Pinter*, 486 U.S. at 649–50).) The facts here are not close to the line that the Court drew in *Pinter*. The *Pinter* Court rejected the "substantial factor" test because it would "easily embrace those who merely assist in another's solicitation efforts," like "accountants and lawyers" who perform standard professional services for clients. *Pinter*, 486 U.S. at 651 & n.27; *see Tezos*, 2018 WL 4293341, at *9–10 (holding that intermediary who converted US dollars to Bitcoin was not a statutory seller). The Compound partnership bears no resemblance to accountants or lawyers or other third-party vendors who "merely assist in another's solicitation efforts" as "collateral participants." *Pinter*, 486 U.S. at 650–51 & nn. 26, 27. Compound is the entity that designed the securities, issued the securities, distributed the securities, and monetized the securities—it did not merely help someone else do so.

*Second*, Compound persuaded multiple crypto asset exchanges to list COMP for trading. (FAC ¶ 83.) Although sophisticated users can trade crypto assets without a centralized exchange, average investors—like Plaintiffs here—trade crypto assets on centralized exchanges like Coinbase and FTX. But those assets do not just magically appear on crypto exchanges. Instead, the issuers of a token must take affirmative steps to secure the listing, including by directly contacting the exchanges, requesting that the token be listed on the exchanges, and compensating the exchanges. (*Id.* ¶ 85.) And that is what Defendants did here: One or more of them, acting on behalf of Compound, worked directly with Coinbase, FTX, Kraken, Robinhood, Uphold, Nexo, Binance, KuCoin, and other exchanges to ensure that investors could buy and sell COMP. (*Id.* ¶¶ 83–87; *see also id.* ¶ 82.) Phrased differently, Compound convinced and paid third parties to ensure that there would be an easy way for people to buy and sell COMP to and from each other on a liquid secondary market, and Compound did this for the specific purpose of increasing the price of COMP. (*Id.* ¶¶ 68–69, 82–87.)

That conduct alone would, again, meet the test for solicitation. In cases under Section 12(a)(2) of the Securities Act, courts in this district have held that merely signing a registration statement and prospectus is enough to constitute solicitation. *See Pirani*, 445 F. Supp. 3d at 384 (signing registration statement and prospectus constitutes solicitation); *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 549 (N.D. Cal. 2009) ("As many courts have found, the registration statement is itself a solicitation document."); *In re Portal Software, Inc. Sec. Litig.*, No. 03-cv-5138, 2006 WL 2385250, at *4 (N.D. Cal. Aug. 17, 2006) (finding solicitation based on defendants' "participating in, and signing, the preparation of the false and misleading Prospectus"). Preparing and signing those documents enables and encourages securities sales on a traditional exchange, and therefore constitute solicitation. Likewise here, Defendants' submission of listing requests and other communications with exchanges (*see* FAC ¶¶ 67-69, 82, 85–87), enabled and encouraged COMP sales on crypto exchanges, and therefore constitute solicitation. To the question "Why did Compound submit its security to be listed on Coinbase and FTX and Binance and so on?" there is only one answer: Because more people would buy it. That is solicitation.

*Third*, although Compound is wrong to contend that the securities laws require statements of the "buy these securities!" form, Compound in fact made such statements, starting with its participation in the Coinbase Earn program. Through Coinbase Earn, Compound paid Coinbase to show promotional videos about Compound to its users in exchange for COMP. (FAC ¶¶ 70–73.) If this paid advertisement is not a solicitation, it is hard to imagine what would be. *See, e.g.*, *Wildes*, 25 F.4th at 1346 ("A new means of solicitation is not any less of a solicitation. So when the promoters urged people to buy BitConnect coins in online videos, they still solicited the purchases that followed."); *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988) (holding that defendant was a statutory seller where he specifically directed promotional efforts and hired sales agents); *Davy*, 2021 WL 2940200, at *8

1 (defendant was statutory seller because he "negotiat[ed] and purchas[ed] ad

2 placements with companies that operate virtual currency related websites").

3        Compound's use of the Coinbase Earn program is even more obviously a

4 solicitation than the "indirect, mass communications" the Ninth Circuit deemed

5 sufficient in *Pino*, 55 F.4th 1253: Unlike content posted indiscriminately on YouTube,

6 the Coinbase Earn advertisement was targeted directly at crypto investors who were

7 already on a crypto exchange's website—and it provided those investors with a link

8 to "[v]iew price charts, get live market data, and trade Compound." (FAC ¶ 71; *see*

9 *also id.* ¶ 70 (alleging that Defendant Leshner personally encouraged others to "try"

10 Coinbase Earn to acquire COMP).)

11        *Fourth*, Compound touted the benefits of "decentralization" and urged people

12 to participate in COMP "governance"—and that can be accomplished in practice only

13 by buying COMP. (*Id.* ¶¶ 40-43, 45–47.) Even though, as explained, plaintiffs need

14 not allege statements expressly "urging or persuading buyers to purchase COMP

15 tokens" (Mot. 11–12), Defendants made exactly those kinds of statements. For

16 example, in a public post that remains accessible through a "Learn More" link on

17 Compound's website, Leshner lauded the COMP token as a mechanism for investors

18 "to suggest, debate, and implement changes to Compound" and to "participate in

19 shaping the direction of Compound." (FAC ¶ 43; *see id.* ¶¶ 43–47.) Allowing investors

20 "to participate in governance," Leshner stated, "will be the most important milestone

21 in Compound history." (*Id.* ¶ 46.) These statements, made by Leshner and other

22 Defendants, encouraged people to buy COMP for the opportunity to participate in a

23 supposedly revolutionary governance structure and to "shap[e] the direction of

24 Compound." (*Id.* ¶ 43.)

25        Defendants downplay these statements as "descriptions of . . . the role played

26 by COMP tokens in the governance of the Compound DAO," (Mot. 11), but they

27 nowhere explain why such statements are not solicitations given that they urge

28

people to purchase COMP. Perhaps Defendants mean to argue—although they do not explicitly say this, likely because no authority to supports it—that encouraging people to purchase securities for reasons other than strict profit cannot count as statutory selling. As explained above, this is not the law, and it is easy to see why: solicitors who successfully urge environmentalists to purchase a specific security by saying "you should buy this security because the issuing company is environmentally responsible" are statutory sellers no less than if they told people to buy because they promised a high rate of return or a healthy dividend. The fact that Defendants touted COMP's governance rights does not absolve them of liability for urging people to buy it.

In any event, Compound's promotion of "governance" was largely pretext. As the Complaint alleges in detail, Defendants always planned to hold a controlling share of COMP tokens, such that the average investor would have essentially zero say over "the direction of Compound." (*Id.* ¶ 47; *see id.* ¶¶ 104–13.) Defendants also knew that the average investor would not care all that much about voting anyhow, which presumably is why Leshner made the self-described "big design decision" to enable tokenholders to delegate away their voting rights and hold COMP purely as a speculative investment. (*Id.* ¶ 147.) And that presumably is why Defendants did not hesitate to pay Coinbase to list and advertise COMP, even though investors "who store their tokens on Coinbase cannot exercise governance rights." (*Id.* ¶ 72.) Moreover, despite their best efforts to stick to the script, Defendants broke character plenty of times. On one Compound online forum, discussion of COMP as a speculative investment is supposedly discouraged, but Leshner regularly redirects users to a separate forum "for speculative discussion." (*Id.* ¶ 155.) Leshner also occasionally admits that he "would be happier if [COMP's price] were higher." (*Id.* ¶ 144.) And defendant Polychain's CEO repeatedly likened COMP tokens not to voting rights, but to "equity grants." (*Id.* ¶ 152; *see id.* ¶¶ 150–53.) In short, Defendants and investors

knew that despite the "governance" rhetoric, almost everyone who wanted to buy COMP wanted to buy it as a speculative investment.

*Fifth*, Defendants made extensive statements promoting the Compound business. Defendants brush these off as "merely communicat[ing] factual business information about the company." (Mot. 9.) That claim is misguided in multiple respects. For starters, even assuming that this was indeed what Defendants were communicating, Defendants' argument ignores how Compound works. Every time people use Compound, they buy COMP from Defendants: In exchange for paying fees to the protocol, users receive COMP. (*E.g.*, FAC ¶¶ 60, 61.) That is, after all, the core "innovation" of Compound's business, the idea it calls "recursive leverage." If, to use Leshner's example, "Nike w[ere] giving out ownership [shares] . . . to its customers with every shoe purchased," (FAC ¶ 154), statements like "buy the new Air Jordans!" would be solicitations because they would "urge" people to engage in a transaction that constitutes a purchase of Nike stock. *See, e.g.*, 15 U.S.C. § 77b(a)(3) ("The term 'sale' or 'sell' shall include every . . . disposition of a security . . . for value."); *SEC v. Sierra Brokerage Servs., Inc.*, 608 F. Supp. 2d 923, 940–41 (S.D. Ohio 2009), *aff'd*, 712 F.3d 321 (6th Cir. 2013) (holding that even a "gift" is a "sale" if the 'donor' of a security derives some real benefit from the purported 'gift.'"). Compound's attempts to avoid reckoning with its own statements by characterizing them as promotion only of Compound's product therefore fail. Indeed, Defendants' implementation of recursive leverage is itself a form of solicitation: Defendants created a system with a feedback loop dependent on, and obviously designed to encourage, a speculative frenzy precisely designed to compel people to buy COMP both directly from Compound and on the secondary market. (*E.g.* FAC ¶¶ 52–62.)

Regardless, Defendants did far more than supply "factual information about the underlying business." (Mot. 9:1–2.) Defendants told the investing public that COMP tokens represented a claim on the revenues of Compound, and they told the

investing public that Compound would have a lot of revenue. Leshner described the Compound protocol as a piece of "financial infrastructure that applications and developers can rely on, *forever*" (FAC ¶ 43), and touted the protocol as "the most effective tool for borrowers in DeFi" (*id.* ¶ 132.). Compound's paid advertisement on Coinbase Earn predicted that Compound would, "100 years from now," "be integrated into many applications around the globe, enabling entirely new products to come to life across a wide range of industries and use cases." (*Id.* ¶ 73). All the while, Defendants and their agents told everyone who would listen that COMP's value was tied to Compound's business prospects. (*See, e.g. id.* ¶ 139 (describing COMP as "an instrument for effectively distributing the fundamental value of the Compound business"); *id.* ¶ 141 (describing COMP as "an attempt to extract revenues from the Compound protocol."); *see also id.* ¶¶ 134, 142, 147, 150–57.) Defendants ignore those allegations. Instead, they quote various allegations that were never intended to show solicitation but instead are in the Complaint to demonstrate what Defendants now concede: (1) that Defendants run Compound as a general partnership, and (2) that COMP is a security. (*See, e.g.* Mot. 10–11 (citing, *e.g.*, FAC ¶¶ 101, 102, 103, 108, 109, 111, 112, 113, 115).)

Defendants are also wrong, as a legal matter, that a solicitation "must be more than providing factual information about the underlying business." (Mot. 9:1–2.) In particular, Defendants do not cite a single case holding that solicitation of unregistered securities must include more than mere factual statements. Instead, their only citation, to SEC Rules 168 and 169 (cited at Mot. 9 n.9) proves the opposite. SEC Rules 168 and 169 provide safe harbors for companies whose securities are in registration to make certain factual statements about their businesses without those statements constituting "offers" to sell. See 17 C.F.R. § 230.168, 230.169. Those safe harbors certainly do not help Defendants, as COMP was never "the subject of an offering pursuant to a registration statement," which is a prerequisite to both safe

harbors' application. 17 C.F.R. § 230.168(3)(a) (providing that "communications containing factual business information . . . shall be deemed not to constitute an offer to sell or offer for sale of a security by an issuer *which is the subject of an offering pursuant to a registration statement* that the issuer proposes to file, or has filed, or that is effective, if the conditions of this section are satisfied" (emphases added)); 17 C.F.R. § 230.169(3)(a) (same). But even worse for Defendants, SEC Rules 168 and 169 show that unless the safe harbor applies, factual information about a business *can* be part of a solicitation. Otherwise the safe harbor would serve no purpose. This confirms that the test for solicitation is broad, and it includes both factual and editorial statements, plus actions, that generally get others to purchase an unregistered security.

In sum, the Complaint's allegations—that Compound designed, issued, distributed, and monetized the COMP security; persuaded crypto exchanges to list the COMP security for public trading; ran advertisements for the COMP security on at least one crypto exchange (the one on which Plaintiffs purchased COMP); and encouraged investors to buy the COMP security by touting both its use for governance and the protocol's business prospects—easily "satisfy Rule 8(a)'s lenient pleading standards" for alleging solicitation. *Pirani*, 445 F. Supp. 3d at 384.

### b.   *Defendants Were Motivated by Financial Gain.*

Defendants do not appear to dispute that they were "motivated at least in part by a desire to serve [their] own financial interests." *Pinter*, 486 U.S. at 647. Among other things, Defendants created COMP and kept most of it for themselves (FAC ¶ 47); they then sold COMP to Compound borrowers and lenders in exchange for fees for the purpose of causing the price of COMP to spiral upward through recursive leverage (*id.* ¶¶ 60–62, 58); they listed COMP on Coinbase for the *specific* purpose of increasing its price (*id.* ¶ 63); and Defendants made a handy profit through all of this (*id.* ¶ 62).

1

2

     c.   *Plaintiffs Need Not Allege That They Relied On Any*
       *Specific Solicitation.*

3

   Solicitor liability does not require that Plaintiffs plead reliance on any specific

4

statement. As the Supreme Court explained in *Pinter*, "[n]o congressional intent to

5

incorporate tort law doctrines of reliance and causation into § 12[(a)](1) emerges from

6

the language or the legislative history of the statute." *Pinter*, 486 U.S. at 652. The

7

Ninth Circuit accordingly held in *Pino*, as it had many times before in cases

8

interpreting Section 12(a)(1) and 12(a)(2), that "[r]eliance is not an element of a

9

section 12[(a)](2) claim." *Pino*, 55 F.4th at 1260 (citing and quoting *Smolen v. Deloitte,*

10

*Haskins & Sells*, 921 F.2d 959, 965 (9th Cir. 1990)); *see also Capri*, 856 F.2d at 478

11

("[T]he language of sections 12[(a)](1) and 12[(a)](2) is identical in meaning."); *In re*

12

*Longfin Corp. Sec. Class Action Litig.*, No. 18-cv-2933, 2019 WL 1569792, at *5

13

(S.D.N.Y. Apr. 11, 2019) ("To state a claim under Section 12(a)(1) of the Securities

14

Act, a plaintiff need not plead scienter, reliance, or fraud.").

15

   Defendants ignore this law and argue that the Amended Complaint should be

16

dismissed because "Plaintiffs fail to explain how any Defendant's statement relates

17

to their purchasing decisions." (Mot. 12:7–8.) This new standard appears to be a

18

simple attempt to depart from *Pinter* and *Pino*, with which Defendants apparently

19

disagree. (Mot. 8 n.8 (claiming that *Pino* "departed from prior precedent" on other

20

issues).) But *Pinter* and *Pino* make clear that solicitor liability does not require

21

reliance, and those cases are the law.

22

   Neither of the two cases Defendants cite for the proposition that Plaintiffs

23

must plead some direct connection between Defendants' statements and their

24

purchasing decisions actually impose any such requirement. (*See* Mot. 12:3–8.) The

25

quoted language from *Pinter* has nothing to do with reliance; it is drawing a

26

distinction between those who give "gratuitous advice" and those who solicit

27

"motivated at least in part by a desire to serve [their] own financial interests," 486

28

**PLAINTIFFS' RESPONSE TO MOTION TO DISMISS**

U.S. at 647, which would have been clear if Defendants had not omitted the end of the quoted sentence. (*See* Mot. 12:7 (using ellipsis to cut off the key distinction the Court was making).) To the extent Defendants are hanging their hat on the word "successfully" in *Pinter*'s statement that liability extends to "the person who *successfully* solicits the purchase," 486 U.S. at 647 (emphasis added), that word reflects only that there is no liability unless "a sale has taken place," *id*. at 644. It does not mean that a plaintiff must link his purchase to a specific solicitation. *See, e.g.*, *Pino*, 55 F.4th at 1260 ("Reliance is not an element.").

The *Tezos* decision is even less helpful for Defendants: Although the court dismissed claims against a venture capitalist who did not engage in any solicitation activity, it denied other defendants' motions to dismiss even though the plaintiff did "not allege . . . awareness of any of the defendant-specific promotional or procedural activity" alleged in the complaint. 2018 WL 4293341, at *3. *Tezos* therefore directly refutes the existence of a reliance requirement under Section 12.

**B.      Defendants Sold COMP Tokens.**

Defendants spend pages making a point that is not in dispute: that Plaintiffs did not allege that they purchased any COMP directly from the COMP general partnership. (Mot. 6:11–8:3.) That is true, but, as explained, being a *direct* seller is not the only, or even most common, way that defendants violate the securities laws. *See supra* I.A–B. As just recounted, Compound is a statutory seller because it solicited the investing public to purchase COMP by encouraging people to acquire COMP tokens and paying intermediaries to help get those tokens into the investing public's wallets. Whether Defendants actually passed title directly to Plaintiffs is irrelevant.

Defendants stray far from reality, however, when they claim in a footnote that "Compound DAO has [n]ever held or sold any COMP tokens"—to *anyone*. (Mot. 4 n.4.) Even assuming Defendants are referring to *direct* sales in this footnote, they are wrong. Plaintiffs plausibly allege that Compound created COMP tokens and then

distributed those tokens to people who used the Compound protocol and paid fees to Compound. (*E.g.*, FAC ¶¶ 52, 32.) That constitutes "selling" under the securities laws, which defines "selling" broadly to be any "disposition of a security or interest in a security[] for value." 15 U.S.C. § 77b(a)(3). Although bona fide gifts are not sales, *Sierra Brokerage*, 608 F. Supp. 2d at 940, wherever the seller receives "some real benefit from the purported 'gift,' it will be treated as a sale," *id.* (quoting THOMAS LEE HAZEN, 2 LAW OF SECURITIES REGULATION § 5.1 (6th ed. 2009)). This is so even where the *only* value the seller receives is the mere dispersion of ownership of the securities (which helps to create a public trading market for the seller's shares)—even where defendants give the shares away in direct exchange for *nothing*, a "sale" may occur. *Id.* (quoting *SEC v. Phan*, 500 F.3d 895, 906 (9th Cir. 2007); *In the Matter of Cap. Gen. Corp.*, Release No. 7008 (SEC July 23, 1993)). Here, not only did Compound give COMP tokens to users for the purpose of disbursing them and creating a secondary market (which it actively created by paying to list COMP on exchanges), Compound did so *in exchange for fees*. Compound indisputably sold COMP tokens directly to users of the Compound protocol, and Defendants do not deny that they are liable for Compound's actions as its partners.

### C.   Plaintiffs' Claims Are Timely.

Finally, Defendants argue that Plaintiffs' claims are untimely—or at least that Plaintiffs are foreclosed from relying on certain allegations—because some of Defendants' soliciting statements were made more than a year before this action was filed. (Mot. at 12:9–13:16.) Defendants misconstrue the statute of limitations. As the Supreme Court explained in *Pinter*, and as many courts have explained since, claims under Section 12(a)(1) accrue when plaintiffs purchase the relevant securities, not when the defendant began its solicitation. And because each Plaintiff filed this case within one year of purchase, the claims are timely, and all statements may be considered.

**PLAINTIFFS' RESPONSE TO MOTION TO DISMISS**

1  The Securities Act states that "[n]o action shall be maintained . . . to enforce a

2  liability created under section 12(a)(1), unless brought within one year after the

3  violation upon which it is based." 15 U.S.C. § 77m. Section 12(a)(1), as discussed,

4  creates liability against anyone who "sells a security" without registration, and

5  entitles "the person purchasing such security" from the seller to rescission or

6  rescissory damages. 15 U.S.C. § 77*l*(a). Because the prohibited conduct is the *sale* of

7  the security, that sale is the "violation upon which [liability] is based." 15 U.S.C.

8  § 77m. The statute of limitations thus begins to run from the date of the sale.

9  The Supreme Court in *Pinter* said exactly that, explaining that Section 77m

10  "allow[s] suits *for a full year following sale*." *Pinter*, 486 U.S. at 637 n.13 (emphasis

11  added) (citing 15 U.S.C. § 77m). Anticipating Defendants' argument here, the *Pinter*

12  Court explained that although solicitation conduct "may render a person liable when

13  a sale has taken place," the actual violation does not occur until the moment of the

14  sale: "[A] prospective buyer has no recourse against a person who

15  touts unregistered securities to him if he does not purchase the securities." *Pinter*,

16  486 U.S. at 644. And because the violation is the trigger for the statute of limitations,

17  15 U.S.C. § 77m, the limitations period does not begin to run until the sale, *id.* at 637

18  n.13.

19  The Ninth Circuit reached the same conclusion in *Toombs v. Leone*, 777 F.2d

20  465 (9th Cir. 1985), explaining: "[Plaintiff] alleges that he purchased his interest . . .

21  on March 15, 1978 . . . Thus, this court must take March 15, 1978 as the time of the

22  alleged violation." *Id.* at 468; *accord In re Med. Cap. Sec. Litig.*, No. 10-ml-2145, 2010

23  WL 11508331, at *4 (C.D. Cal. Aug. 11, 2010) ("The Court finds that the statute of

24  limitations for Section 12(a)(1) violations tolls upon the violation, which is the sale of

25  the security."). And the Second Circuit, in an opinion by Judge Friendly, held the

26  same, explaining that "it would be unreasonable to read [15 U.S.C. § 77m] as starting

27  the short period for an action at a date before the action could have been brought—a

28

23

construction which might lead in some extreme cases to a running of the statute of limitations before the claim had even arisen." *Diskin v. Lomasney & Co.*, 452 F.2d 871, 875–76 (2d Cir. 1971); *see also City of Pontiac Gen. Employees' Ret. Sys. v. MBIA*, *Inc.*, 637 F.3d 169, 176 (2d Cir. 2011) ("[A] statute of limitations cannot begin to run until the plaintiff's claim has accrued.").

Ignoring these authorities on this long-settled issue, Defendants propose a novel interpretation under which the statute of limitations starts to run not on the date of the sale, but on the date of some unspecified solicitation activity—Defendants do not say whether this would be the first solicitation, the last solicitation, or something in between. Their only authority for this proposition is the non-binding, out-of-circuit, unpublished district court decision in *Anderson v. Binance*, No. 20-cv-2803, 2022 WL 976824 (S.D.N.Y. March 31, 2022), *on appeal sub nom. Lee v. Binance*, No. 22-972 (2d. Cir). But *Anderson* was wrongly decided, is currently on appeal, and is exceedingly likely to be reversed because, among other things, it conflicts with *Pinter* and the Second Circuit's decision in *Diskin*. And regardless, the rule in *this* circuit, at least since *Toombs*, is that the statute of limitations begins to run on the date of the sale. This Court thus could not—and in any event should not—depart from the weight of authority. The statute of limitations runs from the date of Plaintiffs' purchase.

Defendants' only other two authorities—*Toombs* and *Zakinov v. Ripple Labs*, No. 18-cv-06753, 2020 WL 922815 (N.D. Cal. Feb. 26, 2020)—are cited for only the proposition that a plaintiff "must affirmatively plead sufficient facts in his complaint to demonstrate conformity with the statute of limitations." Mot. 12 (quoting *Toombs*, 777 F.3d at 468).) Plaintiffs have satisfied that requirement by pleading that they purchased COMP in January 2022 (FAC ¶ 15), November 2022 (*id.* ¶ 16), and December 26, 2021 (*id.* ¶ 17)—all less than a year before the original complaint was filed on December 8, 2022. (ECF 1).

1

## V.   CONCLUSION

2    For the foregoing reasons, Defendants' motion to dismiss should be denied.

3

4    Respectfully submitted,

5                                        */s/ Jason Harrow*
                                        Jason Harrow
6                                        (Cal. Bar No. 308560)
                                        GERSTEIN HARROW LLP
7                                        3243B S. La Cienega Blvd.
                                        Los Angeles, CA 90016
8                                        jason@gerstein-harrow.com
                                        (323) 744-5293
9

10                                       */s/ Charles Gerstein*
                                        Charles Gerstein
11                                       (*pro hac vice*)
                                        Emily Gerrick
12                                       (*pro hac vice*)
                                        GERSTEIN HARROW LLP
13                                       810 7th Street NE, Suite 301
                                        Washington, DC 20002
14                                       charlie@gerstein-harrow.com
                                        (202) 670-4809
15

16                                       */s/ James Crooks*
17                                       James Crooks
                                        (*pro hac vice*)
18                                       Michael Lieberman
                                        (*pro hac vice*)
19                                       FAIRMARK PARTNERS, LLP
                                        1825 7th Street NW, #821
20                                       Washington, DC 20001
                                        jamie@fairmarklaw.com
21                                       (619) 507-4182
22

23                                       *Attorneys for Plaintiffs*

24

25

26

27

28

**PLAINTIFFS' RESPONSE TO MOTION TO DISMISS**