**CLEARY GOTTLIEB STEEN
& HAMILTON LLP**
Jennifer Kennedy Park (SBN 344888)
jkpark@cgsh.com

1841 Page Mill Rd Suite 250
Palo Alto, CA 94304
Tel: +1 (650) 815-4100

Roger A. Cooper (Admitted *pro hac vice*)
Jared Gerber (Admitted *pro hac vice*)
Samuel Levander (Admitted *pro hac vice*)

One Liberty Plaza
New York, NY 10006

Attorneys for Defendant
POLYCHAIN ALCHEMY, LLC.

[*additional parties in signature block*]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Amanda Houghton; Charles Douglas; and Susan Franklin,<br><br>Plaintiffs,<br><br>v.<br><br>Compound DAO; Robert Leshner; Geoffrey Hayes; AH Capital Management, LLC; Polychain Alchemy, LLC; Bain Capital Ventures (GP), LLC; Gauntlet Networks, Inc.; Paradigm Operations LP,<br><br>Defendants. | Case No. 3:22-cv-07781-WHO<br><br>**DEFENDANTS' STATEMENT OF RECENT DECISION (CIVIL LOCAL RULE 7-3(d)(2))**<br><br>Hearing Date: August 16, 2023<br>Time: 2:00 PM<br>Courtroom: Courtroom 2<br>Before: Hon. William H. Orrick |

1

**STATEMENT OF RECENT DECISION**

2       Pursuant to Civil Local Rule 7-3(d)(2), Defendants Robert Leshner, Geoffrey Hayes, AH

3   Capital Management, LLC, Polychain Alchemy, LLC, Bain Capital Ventures (GP), LLC,

4   Gauntlet Networks, Inc., and Paradigm Operations LP respectfully submit this Statement of

5   Recent Decision in support of their Motion to Dismiss Plaintiffs' First Amended Complaint,

6   notifying the Court of the following judicial opinion, of which pages 38-48 are relevant to this

7   litigation: *Risley et al. v. Universal Navigation Inc., d/b/a Uniswap Labs et al.*, 1:22-cv-02780-

8   KPF (S.D.N.Y. Aug. 29, 2023).  This decision was published after the July 27, 2023 deadline for

9   filing the Reply in Support of Defendants' Motion to Dismiss.  A copy of this decision is attached

10  as Exhibit 1.

11

12   Dated: September 11, 2023                  Respectfully submitted,

13                                              CLEARY GOTTLIEB STEEN & HAMILTON LLP

14                                              */s/ Jennifer Kennedy Park*
15                                              Jennifer Kennedy Park (SBN 344888)
                                                jkpark@cgsh.com
16                                              1841 Page Mill Rd Suite 250
                                                Palo Alto, CA 94304
17                                              Tel: +1 (650) 815-4100

18                                              Roger A. Cooper (Admitted *pro hac vice*)
                                                racooper@cgsh.com
19                                              Jared Gerber (Admitted *pro hac vice*)
                                                jgerber@cgsh.com
20                                              Samuel Levander (Admitted *pro hac vice*)
                                                slevander@cgsh.com
21                                              One Liberty Plaza
                                                New York, NY 10006
22                                              Tel: +1 (212) 225-2000

23                                              *Attorneys for Defendant*
                                                *Polychain Alchemy, LLC*

24                                              LATHAM & WATKINS LLP

25                                              */s/ Matthew Rawlinson*
26                                              Matthew Rawlinson (SBN 231890)
                                                matt.rawlinson@lw.com
27                                              140 Scott Drive
                                                Menlo Park, CA 94025
28                                              Tel: +1 (650) 328-4600

1

2  Morgan E. Whitworth (SBN 304907)
   morgan.whitworth@lw.com

3  505 Montgomery Street, Suite 2000
   San Francisco, CA 94111

4  Tel: +1 (415) 391-0600

5  Douglas K. Yatter (SBN 236089)
   douglas.yatter@lw.com

6  Benjamin Naftalis (Admitted *pro hac vice*)
   benjamin.naftalis@lw.com

7  1271 Avenue of the Americas
   New York, NY 10020

8  Tel: +1 (212) 906-1200

9  Susan E. Engel (Admitted *pro hac vice*)
   susan.engel@lw.com

10 555 Eleventh Street, NW, Suite 1000
   Washington, D.C. 20004

11 Tel: +1 (212) 637-2200

12 *Attorneys for Defendant AH Capital Management,*
   *L.L.C.*

13 SKADDEN, ARPS, SLATE, MEAGHER & FLOM
   LLP

14
   */s/ Peter B. Morrison*

15 Peter B. Morrison (SBN 230148)
   peter.morrison@skadden.com

16 Zachary M. Faigen (SBN 294716)
   zack.faigen@skadden.com

17 300 South Grand Avenue, Suite 3400
   Los Angeles, CA 90071

18 Tel: +1 (213) 687-5000

19 Alexander C. Drylewski (Admitted *pro hac vice*)
   alexander.drylewski@skadden.com

20 One Manhattan West
   New York, NY 10001

21 Tel: +1 (212) 735-3000

22 *Attorneys for Defendant Paradigm Operations LP*

23 JENNER & BLOCK LLP

24
   */s/ Kayvan B. Sadeghi*

25 Kayvan B. Sadeghi (Admitted *pro hac vice*)
   ksadeghi@jenner.com

26 1155 Avenue of the Americas
   New York, NY 10036

27 Tel: +1 (212) 891 1600

28

Benjamin T. Hand (Cal. Bar No. 330451)
bhand@jenner.com
455 Market Street Suite 2100
San Francisco, CA 94105
Tel: +1 (628) 267-6800

*Attorneys for Defendant Bain Capital Ventures
(GP), LLC*

MORRISON COHEN LLP
*/s/ Jason Gottlieb*
Jason Gottlieb (Admitted *pro hac vice*)
jgottlieb@morrisoncohen.com
Michael Mix (Admitted *pro hac vice*)
mmix@morrisoncohen.com
Edward P. Gilbert (Admitted *pro hac vice*)
egilbert@morrisoncohen.com
Vani Upadhyaya (Admitted *pro hac vice*)
vupadhyaya@morrisoncohen.com
909 Third Avenue
New York, NY 10022
Tel: +1 (212) 735-8600

LONDON & STOUT P.C.
Ellen London (SBN 325580)
elondon@londonstoutlaw.com
1999 Harrison St., Suite 655
Oakland, CA 94612
Tel: +1 (415) 862-8494

*Attorneys for Defendants*
*Robert Leshner, Geoffrey Hayes,*
*and Gauntlet Networks, Inc.*

# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NESSA RISLEY, JAMES FREELAND, ROBERT
SCOTT, ANNIE VENESKY, ANDREW CARDIS, and
DEAN MEYERS, *individually and on behalf of all
others similarly situated*,

                           Lead Plaintiffs,

                           -v.-

UNIVERSAL NAVIGATION INC., *d/b/a Uniswap Labs*,
HAYDEN Z. ADAMS, PARADIGM OPERATIONS LP,
AH CAPITAL MANAGEMENT, L.L.C., *d/b/a
Andreessen Horowitz*, UNION SQUARE VENTURES,
LLC, and UNISWAP FOUNDATION,

                           Defendants.

---

22 Civ. 2780 (KPF)

**OPINION AND
ORDER**

KATHERINE POLK FAILLA, District Judge:

      In this case of first impression, the Court considers whether the
developers of and investors in the Uniswap Protocol trading platform (the
"Protocol"), a decentralized cryptocurrency exchange, are subject to various
provisions of the federal securities laws as currently written. Specifically, this
Opinion resolves a series of motions to dismiss a putative securities class
action filed against Universal Navigation Inc., doing business as Uniswap Labs
("Labs"), and its CEO Hayden Z. Adams ("Adams"); the Uniswap Foundation
(the "Foundation," and together with Labs, the "Uniswap Defendants");
Paradigm Operations LP ("Paradigm"), AH Capital Management, L.L.C., doing
business as Andreesen Horowitz ("Andreesen Horowitz"), and Union Square
Ventures, LLC ("USV," together with Paradigm and Andreesen Horowitz, the
"VC Defendants," and together with the Uniswap Defendants, "Defendants").

Plaintiffs claim that they lost money after investing in what turned out to be various "scam tokens" that were issued and traded on the Protocol (the "Scam Tokens" or "Tokens"). Due to the Protocol's decentralized nature, the identities of the Scam Token issuers are basically unknown and unknowable, leaving Plaintiffs with an identifiable injury but no identifiable defendant. Undaunted, they now sue the Uniswap Defendants and the VC Defendants, hoping that this Court might overlook the fact that the current state of cryptocurrency regulation leaves them without recourse, at least as to the specific claims alleged in this suit. As set forth in the remainder of this Opinion, the Court dismisses their complaint in full.

**BACKGROUND**[1]

A. **Factual Background**

1. **The Parties**

Plaintiffs Nessa Risley ("Risley"), James Freeland ("Freeland"), Robert

---

[1] This Opinion draws its facts from the First Amended Complaint (the "FAC" (Dkt. #46)), the well-pleaded allegations of which are taken as true on this motion. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). The Court also relies, as appropriate, on certain of the exhibits attached to the Declaration of Brandon Fetzer ("Fetzer Decl., Ex. [ ]" (Dkt. #68)), including the v2 Whitepaper ("v2 Whitepaper" (Dkt. #68-1)), the Pools webpage ("Pools" (Dkt. #68-3)), certain July 24, 2021 tweets from Adams ("July 2021 Tweets" (Dkt. #68-4)), and a notice from the Uniswap Interface webpage restricting user access to certain tokens (the "Interface Notice" (Dkt. # 68-5)); as well as certain exhibits attached to the Declaration of James R. Serritella ("Serritella Decl., Ex. [ ]" (Dkt. #83)), each of which is incorporated by reference in the FAC. *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that on a motion to dismiss, courts may consider documents incorporated by reference and documents integral to a complaint).

For ease of reference, the Court refers to Adams's and Labs's joint memorandum of law in support of their motion to dismiss as "Labs Br." (Dkt. #67); to the VC Defendants' memorandum of law in support of their motion to dismiss as "VC Br." (Dkt. #70); to the Foundation's memorandum of law in support of its motion to dismiss as "Foundation Br." (Dkt. #74); to Plaintiffs' omnibus memorandum of law in opposition to Defendants' motions to dismiss as "Pl. Opp." (Dkt. #82); to Adams's and Labs's reply memorandum of law as "Labs Reply" (Dkt. #84); to the VC Defendants' reply memorandum of law as

Scott ("Scott"), Annie Venesky ("Venesky"), Andrew Cardis ("Cardis"), and Dean Meyers ("Meyers") are individuals who each purchased certain of the Tokens on the Protocol (the "Tokens") between December 2020 and March 2022. (FAC ¶¶ 13-18).[2] Plaintiffs are residents of North Carolina, Idaho, New York, North Carolina, and Australia, and each has incurred losses in connection with their Token purchases. (*Id.*).

Defendants Labs and the Foundation are each incorporated in Delaware and maintain their principal places of business in New York. (FAC ¶¶ 19-20). Adams is a citizen and resident of New York, an equity holder in Labs, and is both the inventor of the Protocol and the Chief Executive Officer of Labs. (*Id.* ¶ 21). According to Plaintiffs, Adams is, upon information and belief, also a "significant" liquidity provider for certain tokens traded on the Protocol and holds various UNI governance tokens. (*Id.*). VC Defendants Paradigm, Andreesen Horowitz, and USV are investors in Labs, and assisted in the drafting of the "smart contracts" that allow the Protocol to self-execute transactions with little need for human interaction. (*Id.* ¶¶ 22-24, 81, 103-104). Also upon Plaintiffs' information and belief, each of the VC Defendants is

---

"VC Reply" (Dkt. #85); and to the Foundation's reply memorandum of law as "Foundation Reply" (Dkt. #86).

[2] The Tokens include: Alphawolf Finance, Bezoge, BoomBaby.io, Ethereum Max, Matrix Samurai, Rocket Bunny, Akita, Archangel, Ares Protocol, Autz, Cyber Doge, Dent, Dogg Token, Ethereum Chain Token, Ethereum Max, FEGtoken, Goku Inu, Hoge.finance, HoloToken, Jupiter, Kawakami Inu, Kishu Inu, The Official Mine Token, Mononoke Inu, Pundi X Token, Saitama, Sanshu Inu, Smooth Love Potion, StarLink, Stoner Doge, Vera, YfDai.finance, Dogelon, HuskyToken, Lorde Edge, Shih Tzu, Wise Token, Lukso Token, Olympus Dao, and Samsung Metaverse. (*See, e.g.*, FAC ¶¶ 5, 200-696).

a "significant" liquidity provider for various tokens traded on the Protocol and each holds UNI governance tokens.  (*Id.*).

### 2.    Cryptocurrency, Blockchains, and Decentralized Exchanges

By way of background, a "cryptocurrency," crypto asset, or token is a digital asset created and traded in the digital world that is designed to be a medium of exchange or a store of value.  (FAC ¶ 33).  Every crypto asset is powered by a decentralized digital ledger called a "blockchain."  (*Id.* ¶ 35).  Blockchains consist of "blocks" of data that track the ownership and transfer of crypto assets on a given network, dating back to the first-ever transaction on that network.  (*Id.*).  Each blockchain is subject to different technical rules, but they generally are all open source — meaning the source code of the software "is available free of charge to the public to use, copy, modify, sublicense, or distribute," *Open-Source*, DICTIONARY.COM, https://www.dictionary.com/browse/open%20source (last visited August 29, 2023) — and each relies on its community to maintain and develop its underlying code.  (FAC ¶ 35).  The most well-known crypto assets, such as Bitcoin and Ether, are obtained in one of two ways — either by expending resources to validate transactions on the blockchain in exchange for a reward of newly minted tokens (a process known as "mining" or "validating"), or by acquiring them from someone else using, most commonly, an online crypto asset exchange that matches buyers to sellers.  (*Id.* ¶¶ 36-37).  These exchanges can be either centralized or decentralized.

4

In a traditional stock or centralized cryptocurrency exchange, buyers and sellers are matched on a one-to-one basis through orders — when a buyer's bid matches the seller's ask, a trade occurs.  (FAC ¶ 38).  By contrast, in a *de*centralized exchange (also known as a "DeFi" exchange), buyers and sellers are empowered to use nontraditional methods to trade and create tokens including, as relevant here, liquidity pools.  (*Id.* ¶ 39).  There, instead of users interacting with each other and matching trades, they interact with the pool. (*Id.* ¶¶ 39, 78, 85).

### 3.    The Ethereum Blockchain and ERC-20 Coin Offerings

Before diving deeper into liquidity pools, some additional context is necessary.  The Ethereum blockchain launched in or around 2015 with the native token Ether or "ETH."  (FAC ¶ 41).  ETH is the second largest crypto asset, with a market capitalization as of the time of the FAC of more than $160 billion.  (*Id.*).  The Ethereum blockchain allows for the use of "smart contracts," which are self-executing, self-enforcing programs that write the terms of the agreement between the buyer and seller of tokens directly into the program's code — that is, when a given event occurs, the trade auto-executes, without the need for third-party intervention from banks, lawyers, accountants, or the like. (*Id.* ¶ 42).

Adams first began writing smart contracts for Ethereum in 2017, and, with Labs, launched version one of the Protocol ("v1") on the main Ethereum blockchain on November 2, 2018, and version two ("v2") in May 2020, and

version three ("v3") in May 2021.[3]  (FAC ¶¶ 51, 77, 96).  The Protocol is an "on-chain [(meaning it operates directly on the blockchain)] system of smart contracts" that functions through an "Automated Market Maker" or "AMM," which Uniswap claims replaces the buy and sell orders in an order book market with liquidity pools, as discussed in more detail below.  (*Id.* ¶ 78; v2 Whitepaper 1).

To provide uniform transactions and efficient processes across the blockchain, and to allow for the creation of new crypto tokens, the Ethereum community uses application standards for smart contracts called Ethereum Requests for Comments ("ERCs").  (FAC ¶ 43).  ERC-20 is an application standard that allows for smart contract tokens to be created on Ethereum, each of which creates "ERC-20 tokens."  (*Id.* ¶¶ 44-45).  These tokens, also known as "alt coins," can be created by anyone with a basic understanding of Ethereum and are traded on the Ethereum blockchain.  (*Id.* ¶¶ 44-45).  Issuers who create ERC-20 tokens are known as "developers"; each of them theoretically could register their tokens with the Securities and Exchange Commission (the "SEC"), but such registrations are few, as Congress and the courts have yet to make a definitive determination as to whether such tokens constitute securities, commodities, or something else.  (*Id.* ¶ 45).

---

[3]    While users can still access and use all versions of the Protocol, v2 allows for the deposit and exchange of ERC20/ERC20 pairs, as opposed to just the ERC20/ETH pairs on v1.  (v2 Whitepaper 1; FAC ¶ 77).  v3 operates in a similar manner to v2, but with some additional features.  (FAC ¶ 96).  The record and existence of each, as discussed, lives on the blockchain *ad infinitum*.

In 2021, in an effort to capitalize on increased enthusiasm in the crypto

market, companies and issuers sought to raise funds through "initial coin

offerings," many if not most of which were launched as ERC-20 tokens and not

registered with the SEC.  (FAC ¶ 47).  Issuers would instead issue whitepapers

regarding their new coin offering; these documents provided little if any

information that would otherwise be required as part of an SEC registration

statement, namely: (i) a "plain English" description of the offering; (ii) a list of

key risk factors; (iii) a description of important information and incentives

concerning management; (iv) warnings about relying on forward-looking

statements; and (v) an explanation of how the proceeds from the offering would

be used.  (*Id.* ¶ 48).  Additionally, token issuers would market their offerings

through social media sites, piggybacking off of the "meme stock" craze in 2020,

which led to a rise in amateur investor activity.  (*Id.* ¶¶ 55-59).  Many of these

issuers flocked to the Protocol, which allowed them to issue new ERC-20

tokens anonymously, without any sort of conduct verification or background

check.  (*Id.* ¶ 59).  With this context in mind, the Court turns to the liquidity

pools that underlie the Protocol's operations.

### 4.    Liquidity Pools

Liquidity pools allow an issuer to create a new token by contributing a

pair of tokens — token A being a preexisting token with some inherent value

(*e.g.*, ETH), and token B being the issuer's new token (often with little to no

inherent value) — to a pool where buyers can trade their token A in exchange

for the issuer's new token B.  (FAC ¶¶ 39, 79; Pools 1).  Whoever seeds the pool

with an initial deposit of each token — typically the issuer — is the one who

sets the initial price of the token, since the pool is created by depositing an

equal value (but not necessarily an equal number) of both tokens into the pool.

(Pools 1; FAC ¶ 88).  In practice, issuers typically launch ERC-20 tokens by

placing an extremely large number (more than a trillion) of their tokens into a

new pool along with a small amount of ETH, often worth less than $100,000,

causing the new token to be valued at some fraction of a penny.  (FAC ¶ 88).

For this new token to become attractive to traders like Plaintiffs, its value must

somehow increase.  To accomplish this, outside of issuer advertising and

promotion, investors known as "liquidity providers" place additional token A

into the pool in exchange for token B, thereby increasing liquidity and driving

up the price of token B.  (*Id.* ¶ 39).  Stated differently, token B derives its

market price from the ratio of the two tokens in a given pool; the more liquidity

a provider deposits into a given pool, the higher the price of token B.  (*Id.*).

Liquidity providers are thus crucial to the functioning of a decentralized

crypto exchange, where issuers are creating and listing new tokens every day.

(FAC ¶ 40).  Exchanges are incentivized to pay the liquidity providers interest

in the form of fees, which are charged to traders like Plaintiffs each time they

wish to transact in a pool.  (*Id.* ¶¶ 91-92).  Specifically, written into the code

underlying the Protocol is a command that traders pay a thirty-basis-point fee

8

on every transaction, which is auto-routed to liquidity providers on a *pro rata* basis.  (*Id.*; v2 Whitepaper 1, 5).[4]

Here is how it works in practice: for issuers and liquidity providers to deposit tokens, and for traders to buy and sell them, each must engage with the Protocol's smart contracts, without which the Protocol could not function. There are various contracts in play at any given time.  To begin, with each trade, the relative prices of the two assets shift, and a new market rate for both is determined using a constant formula determined by the core contracts — namely, x*y=k, where x and y represent the quantities (and therefore the value) of each token in the pool and k is a constant value representing the total liquidity, including the value relative to the fees owed to liquidity providers. (FAC ¶¶ 78, 86; v2 Whitepaper 1).  When a trade is executed, traders like Plaintiffs will send the asset they wish to trade into the core contract before calling the "swap" function that will swap their token for the other token in the pool.  (FAC ¶ 81).  At that time, the core contract measures how much of that trader's asset it has received, a process that requires calling the pair contract (i.e., the contract that holds the two tokens) through a router contract that computes the trade or deposit amount and transfers the tokens.  (*Id.*).  Each of these contracts is necessary to facilitate a given trade.  Stated differently, for a trader to get token B in exchange for token A, they need to tell the core

---

[4]    While v2 of the Protocol created a "switch" that, when turned on, allows a five-basis-point portion of that fee to be allocated back to the Protocol, that switch has never been turned on.  (v2 Whitepaper 1; FAC ¶¶ 63, 91).  Nevertheless, Plaintiffs allege that Labs's ability to turn the switch on and off is emblematic of its control over the Protocol.  (FAC ¶ 93).

contract the amount of token A they wish to trade in.  Then, the core contract measures the value of the pair of tokens at that moment through a series of related contracts.  Finally, the core contract will tell the trader how much of token B they can purchase with their proffered amount of token A (plus the trading fee), and the trader can then decide whether they would like to swap.  If they do, they call the swap function, and the trade is executed through a router contract.  (*See id.*).  That trade then results in a new price for the token.  (*Id.* ¶ 86).  The below diagram shows this process in action:



(*Id.*).

Once this trade is executed, the fee charged to the trader is distributed *pro rata* to each liquidity provider in a given pool.   Below is a diagram of a trade in practice:



(*Id.* ¶ 78).

Importantly, the liquidity providers for a given pool cannot immediately access the transaction fees.  Instead, at the moment a liquidity provider deposits liquidity into a pool, the Protocol, pursuant to its coded smart contracts, "mints" so-called "liquidity tokens" or "pool tokens," which effectively operate as a receipt, and represent a given provider's percentage contribution to a pool, plus their *pro rata* share of transaction fees for that pool.  (FAC ¶¶ 79, 92).  To retrieve their underlying liquidity — which is held in the pool's reserves pursuant to the smart pair contract — plus any funds accrued through fees, the liquidity provider must "burn" their liquidity tokens, effectively exchanging them for their portion of the liquidity pool, plus the proportional fee allocation.  (*Id.* ¶ 92; Pools 5).  This drain of liquidity can devalue the issuer's token, and liquidity providers may be incentivized to not "burn" their tokens (that is, take their liquidity out), and instead use their liquidity tokens — themselves tradeable assets — elsewhere.  (v2 Whitepaper 1,

5-6; FAC ¶¶ 79, 92).  Conversely, liquidity providers may wish to burn their tokens while the value is high so that another liquidity provider does not beat them to it, even if that conduct operates to the detriment of issuers, other liquidity providers, and purchasers.  (FAC ¶ 92).

Labs touts this decentralized liquidity pool model as comprised entirely of people-free smart contracts, whose self-executing terms provide for an "autonomous and perpetually running virtual machine, and an open, permissionless, and inclusive access model that produces an exponentially growing ecosystem of virtual assets."  (Pools 3).  With a stated goal of broad accessibility, the Protocol not only removes the so-called middleman from these transactions, but also allows users to interact with the Protocol through a variety of methods in an easy and efficient manner.  (*Id*.).  One way is through the Labs-developed Uniswap Interface (the "Interface," discussed further *infra*), and another is by developers integrating the Protocol's functionality into their own applications without relying on intermediaries or needing permission. (*Id*.).  Plaintiffs counter that Labs nonetheless controls and maintains the liquidity pools across the Protocol by, among other things, (i) holding liquidity provider funds and newly created tokens in Uniswap's proprietary core contracts, (ii) using routers that Labs controls to process all transactions executed by issuers and users of the Protocol, and (iii) issuing Liquidity Tokens when a pool is created, "without which, pools on the Protocol would not function."  (FAC ¶ 80).

### 5.    Scam Tokens

The Protocol, while innovative and more efficient than centralized systems, is nonetheless subject to fraud, in the form of what Plaintiffs and SEC Chairman Gary Gensler refer to as "scam tokens."  (FAC ¶¶ 175-176). Plaintiffs' injuries here are alleged to arise out of the trading of certain scam tokens.  Two common scams that occur on the Protocol are "rug pulls" and "pump and dumps."  (*Id.* ¶¶ 179-180).  In a rug pull, a new issuer deposits their token pair in a liquidity pool and receives liquidity tokens in exchange. (*Id.* ¶ 179).  Traders like Plaintiffs then buy that token based on its value at the moment of purchase.  In a normal scenario, the issuer and other liquidity providers would continue to provide liquidity, and a trader's just-purchased asset would increase in value.  This is good for the traders, who profit from this increased value, and good for the liquidity provider and issuer, who keep the pool afloat and earn fees each time someone buys the token.  In a rug pull, however, instead of keeping their underlying liquidity assets in the pool, the issuer prematurely withdraws or "burns" their liquidity tokens, thereby removing all liquidity from the pool and leaving other investors with now-worthless tokens.  (*Id.*).

Separately, a pump and dump scheme occurs when, prior to launching a new token on the Protocol (thereby creating a new pool), an issuer sends millions or more of the new token to themselves, a fact rarely disclosed to potential investors.  (FAC ¶ 180).  Then, the issuer "pumps," or loudly promotes, their tokens to potential investors, often through social media,

making claims to entice investors to drive up demand.  (*Id.*).  When demand is at its peak, the issuer "dumps" their holdings on the exchange at the highest possible price and cashes out with the profits, again leaving investors with now-worthless tokens.  (*Id.*).

Plaintiffs lay out several other scams that can take place on the Protocol. For example, in what Plaintiffs refer to (somewhat imprecisely) as a Ponzi scheme, an issuer or liquidity provider drains its liquidity from the pool, thereby decreasing the value of the token significantly.  (FAC ¶ 181).  In such a circumstance, because there is now only limited liquidity remaining, investors race to sell their tokens, with each subsequent sale further draining the token's value.  (*Id.*).  Whoever is left thus stands to incur substantial losses.  (*Id.*). Plaintiffs also refer to instances of malicious traders who use bots that are programmed to buy large amounts of tokens to briefly drive up the token's price and then quickly sell to gain an incremental profit.  (*Id.* ¶ 182).

Plaintiffs allege that Labs is aware of these schemes and does nothing to stop them because Defendants stand to profit from the liquidity fees — whether as liquidity providers or as potential or future recipients of smart contract fees. (FAC ¶ 194; *see supra* n.4 (describing the fee switch)).  By providing a marketplace for buyers and sellers, by assisting with the drafting of smart contracts, and by and through their ownership of governance tokens (discussed *infra*), Plaintiffs allege that the Uniswap Defendants and the VC Defendants "facilitate[]" these scam trades — and facilitated Plaintiffs' trades of the Tokens.  (FAC ¶ 197).

14

6. **The Interface**

The Protocol is hosted, in part, on the Interface, a website through which investors can access the Protocol.  (FAC ¶ 64).  Plaintiffs allege that Labs facilitates trading of tokens through its operation of the Interface, though there are other methods by which one can access the Protocol.  (*Id.* ¶ 52; Interface Notice 1).  To access the Interface, users must have a "crypto wallet," a computer application that safeguards holders' private keys, which allow them to send, receive, and access crypto assets.  (*Id.* ¶ 65).  Some of the most popular wallets include Coinbase Wallet, Metamask, and Trust Wallet.  (*Id.*).  Users can get to the Interface (i) through a web browser, by navigating to app.uniswap.org, and clicking "Launch App" and "Connect Wallet" (the "Browser Method"), or (ii) by using the web browser embedded in their wallets to navigate to app.uniswap.org or Uniswap.org and clicking "Launch App" (the "Wallet Method").  (*Id.* ¶¶ 66-67).  Plaintiffs Risley, Freeland, and Meyers conducted their transactions using the Wallet Method, though the putative class is broken into subclasses based on users' various methods of access.  (*Id.* ¶¶ 67, 697).

Once their wallet has been connected, a user can "swap" tokens by identifying which tokens they want to trade in and which they wish to receive. (FAC ¶¶ 68-69).  Once they have made their selection, the Protocol — pursuant to the core contract — calculates the trading fee and swaps one token for another, determining the trade-in value based on the set formula, described earlier.  (FAC ¶¶ 69, 81, 86).  The first time a user attempts to swap a token or

15

add liquidity using the Protocol, they must "approve" the transaction, thus "giv[ing] the Uniswap Protocol permission to swap that token from [their] wallet." (*Id.* ¶ 71 (quoting What Is An Approval Transaction?, Uniswap Help Center, https://support.uniswap.org/hc/en-us/articles/8120520483085 (last visited August 29, 2023 ("Approval FAQ"))). Effectively, the user is calling the function "swap" on the Protocol's smart contract, which the code then auto-executes without the involvement of an intermediary. (Pools 3). Before proceeding with their swap, users typically set a "slippage tolerance," which dictates the degree of price fluctuation a trader is comfortable with, and will effectively cancel the transaction should the price drop below that point before the transaction is completed. (FAC ¶ 70).

On April 23, 2021, Labs posted terms of service for the Interface on a page of its website, and subsequently updated those terms on October 25, 2021. (FAC ¶ 74 (citing Uniswap Labs Terms of Service, Uniswap.org, https://uniswap.org/terms-of-service (last visited August 29, 2023 ("Interface Terms")))).[5] At some point after April 23, 2021, the Interface began prompting Browser Method users with a disclaimer that, by transacting, they agreed to the terms of service and acknowledged that they had read and understood the "Uniswap Protocol Disclaimer." (*Id.*). Users accessing the Interface via the Wallet Method are not now prompted with such a disclaimer, nor were they

---

[5]     As of the date of this Court's writing, the terms were last updated on March 3, 2023. (Uniswap Labs Terms of Service, Uniswap.org, https://uniswap.org/terms-of-service (last visited August 29, 2023))).

presented with any terms, disclaimers, or disclosures at any point prior to the filing of the FAC.  (*Id.* ¶¶ 73, 75).

The Interface Terms state that Uniswap "do[es] not broker trading orders on your behalf nor do we collect fees from your trades on the Protocol.  We also do not facilitate the execution or settlement of your trades, which occur entirely on the publicly distributed Ethereum blockchain."  (FAC ¶ 76 (quoting Interface Terms)).  Plaintiffs allege that such claims are patently false and legally unenforceable, as "[Labs] collects fees (and can keep a portion of those fees for itself) and undoubtedly acts as the broker, facilitator, and seller in connection with all trades on the Protocol, including, without limitation, through its ownership and operation of the Interface."  (*Id.*; *see also id.* ¶ 75).  As relevant here, the Interface Terms further provide that:

- The Interface is distinct from the Protocol and is one, but not the exclusive, means of accessing the Protocol. The Protocol itself has three versions, designated as v1, v2, and v3, each of which comprises open-source or source-available self-executing smart contracts that are deployed on … Ethereum.  Uniswap Labs does not control or operate any version of the Protocol on any blockchain network.  (Interface Terms § 1.1).

- By using the Interface, you understand that you are not buying or selling digital assets from us and that we do not operate any liquidity pools on the Protocol or control trade execution on the Protocol.  When traders pay fees for trades, those fees accrue to liquidity providers for the Protocol.  As a general matter, Uniswap Labs is not a liquidity provider into Protocol liquidity pools.  (*Id.*).

- To access the Interface you must use a non-custodial wallet software, which allows you to interact with public blockchains. … We do not have custody or control over the contents of your wallet and have no ability to retrieve or transfer its contents.  (*Id.*).

17

- The [Interface] is a purely non-custodial application, meaning [Uniswap Labs] do[es] not ever have custody, possession, or control of your digital assets at any time. It further means you are solely responsible for the custody of the cryptographic private keys to the digital asset wallets you hold. (*Id.* § 4.3).

### 7. UNI Tokens, Governance, and the VC Defendants

By its very nature, the Protocol has no centralized ownership structure. However, Plaintiffs allege, Labs "is structured and run as a for-profit business, with the Interface, the Protocol[,] and [Labs's] UNI [token] as its primary assets," each of which it manages and controls through its governance structure. (FAC ¶ 98). This structure is described more fully in this section.

Between April 2019 and June 2020, Labs issued over $12 million worth of equity shares to Adams, Paradigm (a crypto asset hedge fund), Andreesen Horowitz, and USV (two venture capital firms). (FAC ¶¶ 99-100, 103).[6] Plaintiffs claim that "[u]pon information and belief, as liquidity providers, [Adams and the VC Defendants] have contributed millions of dollars' worth of tokens to liquidity pools on the Protocol, thus enriching themselves to the tune of millions of dollars in [u]ser [f]ees." (*Id.* ¶ 101). Furthermore, Plaintiffs allege that (i) despite their lack of knowledge as to the terms of the firms' investments in Labs, the VC Defendants have made "significant contributions to the development and expansion of [Labs] and the Protocol," and (ii) Adams and the

---

[6]    While Labs filed a Form D with the SEC regarding both of these offerings, the terms of any agreement between Labs and the VC Defendants are not publicly available, and therefore "it is unclear at this time what rights [Adams and the VC Defendants] received in connection with the equity acquisition, or how they acquired the same." (FAC ¶¶ 99-100).

VC Defendants, through their equity ownership and "otherwise," were incentivized to — and did — steer Labs to create v2 and v3, thereby allowing for ERC20/ERC20 pairings, all for the purpose of funding more and larger liquidity pools and generating millions in fees. (*Id.* ¶¶ 102, 106; *id.* ¶ 104 (citing Adams's February 11, 2021 tweets thanking the VC Defendants for their assistance in "[a]dvising, ... writing smart contracts, writing whitepapers, reading/explaining other people[']s papers/smart contracts, ... breakthrough Uniswap-related math research ... educating regulators and institutions, ... [n]ot to mention providing millions in funding during the depths of a bear market"); *id.* ¶ 105 (noting that Adams acknowledged that "[Labs] would not be where we are today without our investors."")).  In discussing Paradigm's involvement in particular, Plaintiffs cite to numerous articles discussing Paradigm's critical research and co-creation of various versions of the Protocol, and whitepapers published in connection therewith. (*Id.* ¶¶ 108-111).  Indeed, Plaintiffs allege that v2 and v3 of the Protocol were created without input from users or via governance proposals, thus making the case for Paradigm's intimate connection to Labs.  (*Id.* ¶¶ 111-112).

In September 2020, Labs issued its own token, UNI, which can be purchased on the Protocol.  (FAC ¶ 122).  According to Labs, UNI holders would be granted immediate ownership of Uniswap governance and the UNI community treasury.  (*Id.* ¶ 123).  Labs allocated 40% of the total UNI supply to team members and future employees, investors, and advisors to be distributed over a four-year vesting period, and the remaining 60% was to be split amongst

19

"Uniswap community members," which included historical liquidity providers such as Adams and the VC Defendants.  (*Id.* ¶¶ 124-126).  Plaintiffs allege that in reality, only 15% of this 60% was allocated toward community members, and that of the remaining 45%, the governance treasury retained 43% to be used pursuant to a governance vote.  (*Id.* ¶ 127).  As such, Plaintiffs allege that Defendants hold at least 88% of the total amount of UNI tokens and thus have a disproportionate amount of power and control over Uniswap governance and, by extension, the Protocol.  (*Id.* ¶ 128).[7]  While Plaintiffs have no actual knowledge of the number of UNI tokens each Defendant holds, they allege that the VC Defendants and Adams are each "likely top 10 holders" of the token, and thus have control over the Protocol.  (*Id.* ¶ 134).  Citing to a study of decentralized governance, Plaintiffs aver that "Uniswap is extremely centralized and controlled by a very small number of addresses" that make the platform much more centralized than Defendants let on.  (*Id.* ¶¶ 143-148 (citation omitted)).

In February 2021, Defendants were allegedly part of a governance proposal to create a "DeFi Education Fund" as a means of defending against enforcement actions by regulatory bodies such as the SEC, and legal actions like the instant lawsuit.  (FAC ¶ 151).  The stated goals of the proposal included challenging regulatory efforts to stop or cabin decentralized finance,

---

[7]     Plaintiffs note that Labs actively promotes both UNI and the Protocol to prospective investors on social media, podcasts, websites, and other media, but that is irrelevant to Plaintiffs' claims resulting from their losses from purchases of the Tokens.  (*See* FAC ¶ 133).

and the proposal also called for the allocation of one million UNI tokens to the Fund.  (*Id.* ¶ 154).  The proposal was approved in July 2021, and one year later, Defendants created the Foundation.  (*Id.* ¶¶ 155, 158).

The Foundation was formed in June 2022, but voting on its creation was not complete until August 17, 2022.  (FAC ¶¶ 158-161).  Voting, according to Plaintiffs, was "overwhelmingly" cast by just ten wallets.  (*Id.* ¶ 161).  While they cannot identify who owns these wallets, Plaintiffs allege that Adams and the VC Defendants control a significant amount of UNI tokens, each of which provides them with governance power.  (*Id.* ¶¶ 101, 138, 142 (discussing Andreesen Horowitz's alleged "hidden wallets" and delegation scheme, through which they allegedly control voting on governance matters)).  Despite the existence of over 300,000 UNI token holders, Plaintiffs claim that those who purchased the token on a different exchange (that is, not through the Protocol) are unable to vote in governance proposals.  (Id. ¶ 136).

The stated mission of the Foundation is to support the decentralized growth and sustainability of the Protocol and its supporting ecosystem, and the Foundation's proposal sought $74 million in UNI Tokens to support, in part, operating expenses and grants.  (FAC ¶¶ 163, 167).  This, according to Plaintiffs, was Defendants attempting to "raid" the Uniswap treasury.  (*Id.* ¶ 168).

### 8.    Control over the Interface and the Protocol

Plaintiffs allege that, per its name, Labs *uni*laterally controls the Interface, and jointly controls the Protocol with Adams and the VC Defendants.

(FAC ¶ 117).  In support of this assertion, Plaintiffs point to the fact that Labs

has a software license for the Protocol, and that v3 is subject to a business

source license that allegedly limits the use of its source code under terms and

conditions that Labs can change at any time.  (*Id.* ¶ 121).  Additionally,

Plaintiffs point to the fact that Labs restricted access or "delisted" various

tokens from the Interface at different points in time.  (*Id.* ¶¶ 118-120).  This is

not to say, however, that the delisted tokens were removed from the Protocol.

To the contrary, as Labs noted in a July 23, 2021 post on its website:

> the Uniswap Protocol — unlike the [I]nterface[,] is a set
> of autonomous, decentralized, and immutable smart
> contracts.  It provides unrestricted access to anyone
> with an Internet connection.  Similarly, this action [to
> restrict access to certain tokens through the Interface]
> has no impact on the Uniswap Interface code, which
> remains open source, or the many other portals or
> locally run instances used to access the Uniswap
> Protocol.

(Interface Notice).

Adams made clear in a tweet the differences between the Interface and

the Protocol:  The Interface is an avenue through which users can access the

Protocol, while the Protocol stands on its own on the blockchain and does not

change.  (July 2021 Tweets).  As such, while Labs may be able to shut down a

user's access to a given token on the Interface, that does not stop the user from

finding another way to access and trade that token.  (FAC ¶ 97; July 2021

Tweets).[8]

---

[8]    While Plaintiffs use the term "Uniswap" to at times refer to the Protocol and at other
times refer to the Interface, they are indeed distinct, and likely by design.  Particularly
given the current state of cryptocurrency regulation, the Court is concerned about

9. **The Class Allegations**

Plaintiffs bring this action as a putative class action under Federal Rule of Civil Procedure 23.  (FAC ¶ 697).  They seek certification of a nationwide class defined to include "all persons who purchased any Tokens on the Protocol, or first learned of the circumstances giving rise to their claims, between April 5, 2021[,] and the present and were harmed thereby."  (*Id.*).  Plaintiffs also seek certification of six subclasses: (i) "[a]ll persons who purchased Tokens using the Wallet Method, other than persons in Subclasses 3 and 5"; (ii) "[a]ll persons who purchased Tokens using the Browser Method, other than persons in Subclasses 4 and 6"; (iii) "[a]ll persons who purchased Tokens using the Wallet Method while in the State of Idaho"; (iv) "[a]ll persons who purchased Tokens using the Browser Method while in the State of Idaho"; (v) "[a]ll persons who purchased Tokens using the Wallet Method while in the State of North Carolina"; and (vi) "[a]ll persons who purchased Tokens using the Browser Method while in the State of North Carolina."  (*Id.*).

B. **Procedural Background**

Plaintiff Nessa Risley ("Risley"), a resident of North Carolina, initiated this action with the filing of a complaint on April 4, 2022.  (Dkt. #1).  On April 8, 2022, counsel for Risley published notice of this action through Business Wire, as required by the Private Securities Litigation Reform Act of 1995 (the "PSLRA").  (*See* Dkt. #17).  On June 7, 2022, Risley, along with Freeland, Scott,

---

holding parties liable under the federal securities laws for designing a platform that does not implicate the federal securities laws.

Venesky, Cardis, and Meyers, moved to be appointed lead plaintiffs, and for the Court to appoint Kim & Serritella LLP and Barton LLP as co-lead counsel. (Dkt. #26-30).  On July 27, 2022, the Court scheduled a conference regarding the motion to be held on July 29, 2022.  (Dkt. #38).  Following that conference, and understanding that Defendants took no position on the lead plaintiff and lead counsel motion, the Court entered an order appointing the above individuals as lead plaintiffs and the above law firms as co-lead counsel pursuant to the PSLRA.  (Dkt. #40; *see also* Dkt. #41 (transcript indicating Defendants' position)).  On August 16, 2023, the Court entered the parties' stipulation and order setting a deadline for Plaintiffs to file an amended complaint, and for Defendants to respond.  (Dkt. #44).

Pursuant to that schedule, Plaintiffs filed the FAC on September 27, 2022.  (Dkt. #46).  On October 26, 2022, Labs and Adams filed a pre-motion letter regarding their anticipated motion to dismiss (Dkt. #52), as did the VC Defendants (Dkt. #54) and the Foundation (Dkt. #56).  Plaintiffs filed an omnibus response in opposition to all three letters on November 4, 2022 (Dkt. #60), and the Court held a pre-motion conference on November 9, 2022 (November 9, 2022 Minute Entry).  At that conference, the Court set a briefing schedule for Defendants' respective motions to dismiss and allowed Plaintiffs to file a single omnibus opposition brief.  (Dkt. #61).  On December 21, 2022, Defendants filed their respective motions to dismiss (Dkt. #66-68 (Labs and Adams); Dkt. #69-71 (VC Defendants); Dkt. #73-74 (Foundation)), and Plaintiffs filed their omnibus opposition brief on February 6, 2023 (Dkt. #82-83).

24

Defendants filed their reply briefs on February 28, 2023.  (Dkt. #84-86).
Plaintiffs then filed a letter notice of supplemental authority on April 10, 2023
(Dkt. #87), to which Defendants responded on April 14, 2023 (Dkt. #88), and
Plaintiffs filed another such letter notice on August 21, 2023 (Dkt. #89), to
which Defendants did not respond.

## DISCUSSION

The Court first considers Plaintiffs' claims brought under federal
securities law; if those claims are not viable, there is less of an argument for
the Court exercising supplemental jurisdiction over the remaining state law
claims.  Preliminarily, the Court observes that all of Plaintiffs' claims proceed
from the premise that the Tokens at issue are securities and, by extension, that
the Uniswap Protocol functions as an exchange of such securities.  In this and
other analogous cases, this threshold issue has been hotly contested, as it
determines the applicability *vel non* of the federal securities laws.
Unsurprisingly, Labs "disputes that it is an 'exchange' or 'broker or dealer' as
defined in Section 3 of the Exchange Act, 15 U.S.C. § 78c," but notes that the
Court "need not address those issues in order to decide this motion."  (Labs
Br. 9 n.3).  In the analysis that follows, the Court accepts Plaintiffs' assertion
that the Tokens are *bona fide* securities, but makes no actual finding on this
basis.

## A.    Motions to Dismiss under Federal Rule of Civil Procedure 12(b)(6)

When considering a motion to dismiss under Federal Rule of Civil
Procedure 12(b)(6), a court should "draw all reasonable inferences in [a]

[p]laintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). While the plausibility requirement "is not akin to a 'probability requirement' ... it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* To that end, a plaintiff must provide more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* Moreover, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557). In other words, the factual allegations must "possess enough heft to show that the pleader is entitled to relief." *Twombly*, 550 U.S. at 557 (internal quotation marks omitted).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *see generally United States ex rel. Foreman* v. *AECOM*, 19 F.4th

26

85, 106 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2679 (2022).  Beyond this narrow universe of materials, a court may also consider "facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence" and disregard "allegations in a complaint that contradict or are inconsistent with judicially-noticed facts."  *Becker* v. *Cephalon, Inc.*, No. 14 Civ. 3864 (NSR), 2015 WL 5472311, at *3, 5 (S.D.N.Y. Sept. 15, 2015) (internal quotation marks and citations omitted).

## B.    Plaintiffs' Federal Securities Claims

### 1.    Overview

Plaintiffs assert two sets of primary federal securities claims against all Defendants: one for rescission of Plaintiffs' purportedly unlawful "contracts" with Defendants under Section 29(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78cc, and one for Defendants' alleged violation of Section 12(a)(1) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77e(a), (c), 77*l*(a)(1).  (FAC ¶¶ 708-724, 731-740).  Plaintiffs also bring claims against Adams and the VC Defendants for control person liability under the relevant provisions of each Act.  (*Id.* ¶¶ 725-730, 741-745).  The Court addresses the claims in turn, but begins with a broader perspective.

Each of Plaintiffs' claims stems from losses arising out of scams and other misconduct committed by issuers of the Tokens.  (FAC ¶¶ 195-696).  Due to the decentralized nature of the Protocol's platform, the identity of these issuers is largely unknown, not just to Plaintiffs, but to Defendants as well. (*See id.* ¶¶ 89, 199; *see also id.* ¶¶ 200-231 (discussing the various misleading

27

statements EMAX issuers communicated to the public); *id.* ¶¶ 232-249 (noting that AKITA issuers are anonymous and discussing the issuers' material misstatements and failures to warn); *id.* ¶¶ 250-260 (same for the OHM token); *id.* ¶¶ 599-611 (discussing the lack of meaningful disclosures as to the riskiness of the token and anonymity of the issuers of FF.Lorde Edge token); *id.* ¶¶ 635-647 (same for ECT token); *id.* ¶¶ 686-696 (same for STOGE token)). Therein lies Plaintiffs' dilemma.  In a perfect (or at least, a more transparent) world, Plaintiffs would be able to seek redress from the actual issuers who defrauded them.  In the absence of such information, Plaintiffs are left to argue that Labs facilitated the trades at issue by "providing a marketplace and facilities for bringing together buyers and sellers of securities, in exchange for [it] having the ability to charge a fee on every transaction it made possible on the Protocol" (FAC ¶ 199), and that Labs, Adams, and the VC Defendants, through drafting smart contracts that allow the Protocol to operate and owning UNI governance tokens, somehow "sold" the Tokens as unregistered broker-dealers (*id.*).  In a similar vein, unable to sue the issuers for their potentially unlawful solicitation efforts, Plaintiffs are left to sue Defendants for issuing statements on social media that the Protocol was "for many people" and "safe" to trade on, and for "transferring title" of the tokens in each liquidity pool to Plaintiffs in violation of the Securities Act.  (FAC ¶¶ 9, 52-53, 133, 198, 735; Pl. Opp. 28-30).  As explained below, the Court declines to stretch the federal securities laws to cover the conduct alleged, and concludes that Plaintiffs' concerns are better addressed to Congress than to this Court.

### 2. Plaintiffs Have Not Alleged Defendants' Liability Under Section 29(b) of the Exchange Act

Plaintiffs begin by seeking rescission of certain "contracts" they allegedly entered into with Defendants in purchasing the Tokens on the Protocol; they claim that these contracts are subject to rescission under Section 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b), based on Defendants' operation of an unregistered exchange in violation of Section 5 of the Exchange Act, 15 U.S.C. § 78e, and/or Defendants' conduct as unregistered broker-dealers, in violation of Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78*o*(a)(1).[9]  More specifically, Plaintiffs allege that Defendants contracted with Plaintiffs insofar as (i) the Protocol requires its users to buy and sell tokens using smart contracts drafted by Defendants (namely, the core contracts and router contracts) in order to complete the transactions; (ii) Plaintiffs in fact traded the Tokens on the Protocol, thereby assenting to these contracts; and (iii) Plaintiffs paid fees for each transaction they made pursuant to the terms of the smart contracts.  (FAC ¶¶ 711, 722).[10]  The Court is not convinced by Plaintiffs' allegations.

Section 29(b) provides in relevant part:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and

---

[9]   The parties appear to agree that there is no private right of action under Sections 5 and 15(a)(1) of the Exchange Act.  (*See* Labs Br. 9 n.5; Pl. Opp. 20 n.15).

[10]   Plaintiffs also contend in the FAC that Defendants contracted *with the issuers* to list their tokens on the Protocol through the core and router contracts that each Defendant helped draft, and by using those contracts to issue liquidity tokens to issuers.  (FAC ¶¶ 711, 722).  Plaintiffs wisely abandon this claim in their opposition brief, because even accepting their theory as true, it says nothing about Defendants' privity with *Plaintiffs*.

29

> every contract ... the performance of which involves the
> violation of, or the continuance of any relationship or
> practice in violation of, any provision of this chapter or
> any rule, or regulation thereunder, shall be void ... as
> regards the rights of any person who, in violation of any
> such provision, rule, or regulation, shall have made or
> engaged in the performance of any such contract.

15 U.S.C. § 78cc(b). To establish a violation of Section 29(b), a plaintiff must show that "[i] the contract involved a prohibited transaction, [ii] he is in contractual privity with the defendant[s], and [iii] he is in the class of persons the [Exchange] Act was designed to protect." *EMA Fin., LLC* v. *Vystar Corp.,* No. 19 Civ. 1545 (ALC) (GWG), 2021 WL 1177801, at *2 (S.D.N.Y. Mar. 29, 2021).

With particular respect to the first element, Section 29(b) can only "render[ ] void those contracts which by their terms violate the Act or the rules and regulations thereunder ..., for it is only such contracts which are made in violation of, or the performance of which involves the violation of the statute and the rules and regulations thereunder." *Ema Fin., LLC* v. *Vystar Corp.*, 336 F.R.D. 75, 81 (S.D.N.Y. 2020) (internal quotation marks and citations omitted)). This test manifests the common-law principle that a contract to perform an illegal act is void. *See generally Couldock* & *Bohan, Inc.*, 93 F. Supp. 2d 220, 228 (D. Conn. 2000) ("The federal and state securities statutes codify the common law doctrine invalidating contracts that violate their respective provisions."). However, rescission is not permitted when "the violation complained of is collateral or tangential to the contract between the parties." *Slomiak* v. *Bear Stearns & Co.*, 597 F. Supp. 676, 682 (S.D.N.Y. 1984). Rather,

a contract can be voided where "there could be no performance under the contract without violating the Act." *Id.* (citing *Eastside Church of Christ* v. *Nat'l Plan, Inc.*, 391 F.2d 357 (5th Cir. 1968)).  In other words, "'only unlawful contracts may be rescinded, not unlawful transactions made pursuant to lawful contracts.'" *Underwood* v. *Coinbase Global, Inc.*, — F. Supp. 3d —, No. 21 Civ. 8353 (PAE), 2023 WL 1431965, *11 (S.D.N.Y. Feb. 1, 2023) (quoting *Zerman* v. *Jacobs*, 510 F. Supp. 132, 135 (S.D.N.Y.), *aff'd*, 672 F. 2d 901 (2d Cir. 1981)).

Looking at the allegations in the FAC, it defies logic that a drafter of computer code underlying a particular software platform could be liable under Section 29(b) for a third-party's misuse of that platform.  As discussed, smart contracts are self-executing, self-enforcing code that contain the terms of the agreement between the buyer and seller.  (FAC ¶ 42).  These contracts — specifically, the core and router contracts — allow the Protocol to execute trades, determine price models, charge and distribute fees on a *pro rata* basis to liquidity providers, auto-convert a liquidity provider's deposit into liquidity tokens, and hold tokens in pools until they are ready to be transacted pursuant to a given party's request.  For example, "[w]hen a trade is executed, 'the seller sends the asset to the core contract before calling the swap function. Then the contract measures how much of the asset it has received, by comparing the last recorded balance to its current balance.'" (*Id.* ¶ 81 (quoting v2 Whitepaper 6)).

31

While Plaintiffs are correct that different smart contracts are in operation for each pool (Pl. Opp. 25), those contracts drafted by *Defendants*, which execute the functions discussed above, remain constant subject to the very "core" and "router" contracts upon which Plaintiffs base their claims, similar to an overarching user agreement. (*See, e.g.*, v2 Whitepaper 1 (discussing the smart contracts that allow for v2 to support ERC20/ERC20 pairs rather than only ERC/ERC20 pairs); *id.* at 2 ("using Uniswap v2 will require calling the pair contract through a 'router' contract that computes the trade or deposit amount and transfers funds to the pair contract"); *id.* at 5 (noting the thirty-basis-point (.03%) fee on all trades and the process through which a liquidity provider can collect their accumulated fees); *id.* at 8 (describing the formula used to determine the number of liquidity tokens to be issued when a new liquidity provider deposits tokens into an existing pool)). These foundational contracts are distinctive from the token contracts unique to each pool and drafted by issuers, as discussed below.

Moreover, Plaintiffs argue that because the execution of the underlying smart contracts was necessary for each separate token purchase or sale within the pools, each trade constituted a separate contract. (Pl. Opp. 25). Each such contract, they claim, is voidable because each renders Defendants unregistered broker-dealers of a given Token, in violation of Sections 5 and 15 of the Exchange Act.

Plaintiffs set forth no non-conclusory allegations that each trade constituted a unique contract. Instead, the core and router contracts at issue

32

here write foundational code that executes a constant formula across the Protocol — the formula merely differs based on the inputs (that is, the pairs in a given pool). The contracts relevant to Plaintiffs' claims are *not* these overarching codes provided by Defendants, but rather the pair or token contracts drafted by the issuers themselves. (*See, e.g.,* FAC ¶ 354 ("After this rug pull, the Bunny Issuers re-l[a]unched BUNNY with a new smart contract."); *id.* ¶ 278 (noting that the "fraudulent SAM Issuers deployed SAM on the [P]rotocol but turned off the sell function of the token contract"); *id.* ¶ 325 ("Eventually, all the liquidity in the pool was removed, except for a portion that was locked pursuant to the smart contract for MSX, leaving investors, who were unable to sell their MXS, with worthless tokens."); *id.* ¶ 354 ("The BUNNY Issuers said they would allow investors in BUNNY's smart contract to trade in their tokens for tokens under the new smart contract. However, the Bunny Issuers gave a very tight deadline for investors to make the trade and … most investors in BUNNY did not trade their holdings and lost their entire investment."); *id.* ¶ 395 ("the Kishu Inu Issuers can alter smart contract at any time, meaning they are still in control of the token.")). Unable to hold accountable those who drafted the token contracts, Plaintiffs resort to bringing claims against Defendants for drafting code for the Protocol writ large. Indeed, as Plaintiffs noted, the Ethereum community only created the possibility for ERC-20 tokens out of a desire to standardize protocols for smart contracts across the blockchain. (*Id.* ¶ 43).

Even if the alleged overarching "contracts" were the relevant agreements (though the Court does not believe them to be so),[11] they are not subject to rescission pursuant to Section 29(b).  Rather, the Court analogizes them to the user agreement in *Underwood* v. *Coinbase Global, Inc.*, which the court found not to be unlawful on its face, and therefore not subject to rescission.  In that case, Judge Engelmayer rejected the plaintiffs' contention that each transaction on the Coinbase platform was a separate contract implicating Section 29(b) because (i) as here, plaintiffs failed to identify a transaction-specific contract and (ii) without more, the "notion that ... each individual purchase or sale qualifies as a contract within the meaning of Section 29(a) is without support in the case law."  *Underwood*, 2023 WL 1431965, at *11.  As stated, ERCs stand for "Ethereum Requests for Comments," and are meant to provide a decentralized, community-based way to make transactions uniform across protocols on the blockchain.  (FAC ¶ 43).  This Protocol is part of that system.

This point is further emphasized by the Protocol's transaction approval process.  Plaintiffs note that the first time a user attempts to swap a token or add liquidity using the Protocol, they must "approve" the transaction, thus

---

[11]    The Court notes the recent decision in *Loon* v. *Dep't of Treasury*, No. 23 Civ. 312 (RP), 2023 WL 5313091 (W.D. Tex. Aug. 17, 2023), wherein Judge Pitman found that "smart contracts are merely a code-enabled species of unilateral contracts."  *Id.* at *9-10 (collecting cases noting that smart contracts are self-executing contracts with the terms of the agreement between buyer and seller directly written into lines of code, and likening such contracts to vending machines because they are "tool[s] that carr[y] out a particular, predetermined task").  Even accepting this finding as true, this does not change the Court's analysis of whether such smart contracts are subject to rescission under Section 29(b) as applied to Defendants.

"giv[ing] the Uniswap Protocol permission to swap that token from [their] wallet." (FAC ¶ 71 (quoting Approval FAQ)). After doing so once, the user is seemingly not prompted again when trading in a second pool. This is further evidence that the contracts drafted by Defendants — namely, the core and router contracts underlying the Protocol — serve as a single, foundational base, where any token-specific terms are subject to the issuer who drafts them. (*See, e.g.*, FAC ¶ 354 ("After this rug pull, the Bunny Issuers re-l[a]unched BUNNY with a new smart contract."); *id.* ¶ 278 (noting that the "fraudulent SAM Issuers deployed SAM on the protocol but turned off the sell function of the token contract")).

While no court has yet decided this issue in the context of a decentralized protocol's smart contracts, the Court finds that the smart contracts here were themselves able to be carried out lawfully, as with the exchange of crypto commodities ETH and Bitcoin. (*See* FAC ¶ 170 (describing pools of ETH and wrapped Bitcoin pairs[12] on the Protocol)). *See Underwood*, 2023 WL 1431965, at *12 (holding same with respect to Coinbase's centralized user agreements and allegedly unlawful transactions arising thereunder). Accordingly, the Court finds that Defendants' underlying core and router contracts were collateral to the Scam Token activity — which occurred subject to the Token issuers' activity and, for at least some, the issuer-drafted smart contracts — and constituted the sort of tangential activity that falls outside of

---

[12]    Wrapped tokens are tokenized versions of cryptocurrencies that may exist on other blockchains and are pegged to the value of the original coin. (FAC ¶ 82 (internal quotation marks omitted)).

Section 29(b).  *See Slomiak*, 597 F. Supp. at 682-83 (holding that bank's failure to make required disclosures upon opening of account "did not justify rescission of the account agreement itself or transactions undertaken pursuant to that agreement," because the alleged violations were "clearly collateral" to the contract); *see also Berckeley Inv. Grp., Ltd.* v. *Colkitt*, 455 F.3d 195, 206 (3d Cir. 2006) (declining to rescind contracts where "downstream sales" allegedly carried out in violation of Section 5 of the Securities Act "were tangential to the parties' basic obligations under the Agreement"); *Underwood*, 2023 WL 1431965, at *11 ("'only unlawful contracts may be rescinded, not unlawful transactions made pursuant to lawful contracts'" (quoting *Zerman*, 510 F. Supp. at 135)).

The correctness of the Court's holding is made all the more clear when applied to Plaintiffs' self-driving car theory.  To review, Plaintiffs suggest that a failure to impose liability on the drafters of the code here (*i.e.*, Defendants) would be akin to failing to hold "a technology company that creates self-driving cars with flaws leading to harm or death" liable for those injuries, "regardless of whether they were responsible for such flaws."  (Pl. Opp. 28).  As an initial matter, the Court notes that alleged misdeeds on the Protocol are not analogous to the manufacturing defects Plaintiffs hypothesize.  Nonetheless, and perhaps more critical to this point, Plaintiffs' theory operates on the assumption that the flaw or harm was done *by Defendants* by dint of their creating a system that could allow for the Scam Tokens, and not by the Token issuers themselves.  Indeed, this is less like a manufacturing defect, and more

36

like a suit attempting to hold an application like Venmo or Zelle liable for a drug deal that used the platform to facilitate a fund transfer. There, as here, collateral, third-party human intervention causes the harm, not the underlying platform. In this regard, the Court sees merit in Defendants' counterpoint that this case is more like an effort to hold a developer of self-driving cars liable for a third party's use of the car to commit a traffic violation or to rob a bank. (*See* Labs Reply 6). In those circumstances, one would not sue the car company for facilitating the wrongdoing; they would sue the individual who committed the wrong. Unable to do so given the Protocol's anonymization function, Plaintiffs sue the creators of the Protocol. This they simply cannot do, at least under the current law.

Regulators may someday address this gray area in the securities laws. Indeed, in September 2021, shortly after the SEC announced its investigation of Uniswap, SEC Chairman Gensler warned that decentralized finance projects were under increased scrutiny: "[t]here's still a core group of folks that are not only writing the software, like the open-source software, but they often have governance and fees. There's some incentive structure for those promoters and sponsors in the middle of this." (FAC ¶ 98). This statement alone suggests that, whatever concerns DeFi transactions engender, the law is currently developing around these exchanges, such that Defendants cannot currently be

held liable under a traditional Section 29(b) theory.  In light of the foregoing, Plaintiffs' Section 29(b) claim is dismissed.[13]

### 3. Plaintiffs Have Not Alleged Defendants' Liability Under Section 12(a)(1) of the Securities Act

Plaintiffs alternatively allege that Defendants, as statutory sellers, violated Section 12(a)(1) by offering or selling a security in violation of Section 5 of the Securities Act.  Sections 5(a) and (c) of the Securities Act prohibit any person from selling unregistered securities using any means of interstate commerce unless the securities are exempt from registration.  15 U.S.C. § 77e(a), (c).  To prove a violation of Section 5, the plaintiff must show that "[i] no registration statement was in effect for the securities at issue; [ii] the defendant sold or offered the securities; and [iii] interstate transportation, communication, or the mails were used in connection with the offer or sale." *SEC* v. *Sason*, 433 F. Supp. 3d 496, 513 (S.D.N.Y. 2020).  If the plaintiff meets this *prima facie* burden, the burden shifts to the defendant to show that an exception applies.  *Id.*  Of potential note, Section 5 is a strict liability statute that does not require a showing of scienter or negligence.  *See SEC* v. *Bronson*, 14 F. Supp. 3d 402, 408 (S.D.N.Y. 2014).

Section 12(a)(1) of the Securities Act creates a private right of action for a purchaser against the seller in any transaction that violates Sections 5(a) or (c), and includes the right to sue for damages or rescission.  15 U.S.C. § 77*l*(a)(1); *see, e.g.*, *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n* v. *Nomura Holding*

---

[13]     These same arguments apply to the existence of privity, however the Court need not reach this issue, as Plaintiffs' claims clearly fail as to the first prong of Section 29(b).

*Am., Inc.*, 873 F.3d 85, 137 (2d Cir. 2017) ("A buyer who retains ownership over the security may sue under Section 12 for equitable rescission, which limits recovery to 'the consideration paid for such security.'" (quoting 15 U.S.C. § 77*l*(a))).

"[T]he list of potential defendants in a section 12(a)[(1)] case is governed by a judicial interpretation of section 12 known as the 'statutory seller' requirement." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) ("*Morgan Stanley*").[14] Under the Supreme Court's decision in *Pinter* v. *Dahl*, an individual is a "statutory seller" under either of two scenarios. 486 U.S. 622, 642, 647 (1988). *First*, liability can attach if the defendant "passed title, or other interest in the security, to the buyer for value"; this theory "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller." *Id.* at 644 n.21 (citations omitted). *Second*, liability can attach if the defendant "successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve [its] own financial interests or those of the securities' owner." *Id.* at 647; *see also Morgan Stanley*, 592 F.3d at 359.

Plaintiffs allege both theories. With respect to their passing title theory, Plaintiffs propose that because Defendants wrote, controlled, and maintained

---

[14]   The Court notes that both Sections 12(a)(1) and 12(a)(2) are subject to the statutory seller requirement. *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) (noting that Section 12 as a whole has a statutory seller requirement) (citing *Pinter* v. *Dahl*, 486 U.S. 622, 643-47 & n.21 (1988)).

the smart contracts, and because Defendants both held the Tokens in the pools
through pair contracts and facilitated the Token sales, Defendants necessarily
passed title of the Tokens to Plaintiffs.  (Pl. Opp. 27).  Separately, Plaintiffs
allege that Defendants sold, promoted, and/or solicited the Tokens to Plaintiffs,
at the very least, for purposes of increasing the value of their UNI governance
tokens.  (*Id.* at 28; FAC ¶¶ 195, 197-198, 735).[15]  The Court finds neither
theory to be plausible.

### a.    Plaintiffs' Transfer of Title Theory Fails

Plaintiffs' transfer of title theory can be summarized as follows: because
Defendants wrote the contracts that allow the Protocol to function — including
the "pair contracts" (through which the Tokens were held in Pools) and the
"router contracts" (through which the Tokens were transmitted to Plaintiffs) —
Defendants are statutory sellers for every transaction that takes place on the
Protocol.  (Pl. Opp. 27).  Unfortunately for Plaintiffs, this theory misperceives
Section 12 liability.

The "purchase from" requirement of Section 12 focuses on the
defendant's relationship with the plaintiff-purchaser.  *Pinter*, 486 U.S. at 651.
Critically, *Pinter* refused to extend the definition of seller under Section 12(a)(1)

---

[15]    Plaintiffs suggest in the FAC that the VC Defendants and Adams have "upon
information and belief, contributed millions of dollars to liquidity pools on the Protocol,
allowing them to collect substantial fees on all transactions in connection with these
pools." (FAC ¶ 194).  Even if this were true — as the Court accepts for purposes of the
instant motion to dismiss — Plaintiffs fail to allege that Adams and the VC Defendants
were providers for the Tokens at issue.  Accordingly, there can be no allegation of Token
solicitation for financial gain because Adams and the VC Defendants stood to gain
nothing from Plaintiffs' specific purchases, other than the remote possibility that the
more a given party traded on the Platform, the more UNI tokens Defendants could gain
at some later point.

to include "participants' collateral to the offer or sale" of securities, noting that Congress knew how to explicitly do so if it wished. *Id.* at 650 ("Indeed, [Section] 12's failure to impose express liability for mere participation in unlawful sales transactions suggests that Congress did not intend that the section impose liability on participants' collateral to the offer or sale."). For example, "[u]nder Section 12(a)(1), the 'buyer does not, in any meaningful sense, "purchas[e]" the security from ... participants only remotely related to the relevant aspects of the sales transactions' such as those whose 'involvement is only the performance of their professional services.'" *In re Longfin Corp. Sec. Class Action Litig.*, No. 18 Civ. 2933 (DLC), 2019 WL 1569792, at *6 (S.D.N.Y. April 11, 2019) ("*Longfin*") (quoting *Pinter*, 486 U.S. at 651).

While the cases in this area typically concern lawyers and underwriters, these are precisely the types of individual roles that decentralized exchanges (and the smart contracts that form the basis thereof) were designed to eliminate. (FAC ¶¶ 43, 51; Pl. Opp. 23; Pools 3). Indeed, if those whose role is solely to execute the trades could be held liable under Section 12, shareholders would regularly sue the NASDAQ and/or New York Stock Exchange as a facilitator of any stock purchase that went awry. Just as Section 12(a)(1) does not apply to those who draft base-level agreements for traders to access the stock market, it does not apply to software coders who create an exchange to efficiently facilitate trades. In both circumstances, the party sued facilitated — but was not party to — the contested transaction.

41

Consider, for example, the approval process that a trader must go through the first time it seeks to transact on the Protocol.  That approval "gives the … Protocol permission to swap [the token they wish to trade] from [their] wallet" for another token in the pool.  (FAC ¶ 71 (quoting Approval FAQ)). Effectively, the user is calling the function "swap" on the Protocol's smart contract, which the code then auto-executes absent an intermediary.  (Pools 3). This is to say that the tokens Plaintiffs wished to trade in (call it ETH) for, *e.g.*, BUNNY in the ETH/BUNNY pool, would not be removed from Plaintiffs' wallet until the moment they wished to transact, at which point the formula in the smart contract would reflect a trade-in value, and instantly swap one token for the other.  While Plaintiffs do not argue that this side of the transaction constitutes a transfer of title, it is illustrative of the automated and non-custodial nature of the Protocol.

Focusing next on liquidity providers, the Court observes that they deposit their token pairs into a given pool and are issued liquidity tokens in return.  But just because the pool then "holds" the initial pair of tokens does not mean that the pool somehow holds title to them, especially as applied to software developers and UNI token holders who, at most, can issue new versions and contracts, but not assume title.  This is the purpose for which the liquidity tokens are provided — to give liquidity providers a mechanism not only to accumulate fees and earn passive income, but also to cash in their tokens in exchange for the return of their liquidity once they choose to exit the pool.  Given these facts, the Court cannot see how title transfers at any point

42

from liquidity providers. While Plaintiffs (and traders on the Protocol more broadly) "do not trade with each other directly[,] but instead do so with [Labs] through the liquidity pools [Labs] creates and maintains" (FAC ¶ 78), this does not mean that somehow Defendants have title (even momentarily) over each token on the Protocol. *See Underwood*, 2023 WL 1431965, at *2 (accepting as true plaintiffs' assertion that "[d]ecentralized exchanges, like Craigslist, do not own or hold the assets in question — they simply provide a platform for exchanges between users, along with some features designed to facilitate trading (for example, Craigslist's creation and maintenance of message boards organized by product type or a decentralized exchange's smart contracts), possibly in exchange for advertising revenue or a transaction fee" (internal quotation marks and citation omitted)).

Moreover, the process by which liquidity providers can withdraw their accumulated fees showcases the absence of title transfer on the Protocol. Each time that individuals like Plaintiffs wish to trade in one of the liquidity pools, they are charged a fee for use of the Protocol. Rather than going to Labs, the fee is distributed *pro rata* to each of the liquidity providers in a given pool and held there until the liquidity provider is ready to "burn" their liquidity tokens and effectively exit the pool. (FAC ¶¶ 91-92 (citing v2 Whitepaper 5)). In doing so, they drain their liquidity from the pools. (*Id.* ¶ 92). This clearly shows that the liquidity providers' tokens remain in the pool at all times, and that each provider maintains title in such tokens. Otherwise, when a provider burned their tokens, there would be no impact on a given token's price.

43

Every aspect of the liquidity providers' transactions (other than their individual decisions as to when to deposit and when to withdraw tokens and fees) happens automatically through the code baked into the smart contracts. As Plaintiffs themselves note, the "self-executing, self-enforcing" code of the contracts merely sets a given formula for transactions taking place on the Protocol, inputting various unknown variables in place of numbers to be assessed on a transaction-by-transaction basis. (FAC ¶ 42; v2 Whitepaper 1-3). As such, that Defendants may have drafted the contracts underlying the Protocol does not mean that they have title in the assets traded there. Furthermore, neither Labs, nor Adams, nor any Defendant, can be found to directly control the Protocol to the degree that they hold title to assets on the Protocol simply because they hold certain tokens that can impact how the Protocol may function in the future. And while there may be a degree of governance power afforded to Defendants to make new contracts giving them some sort of title ownership, that is not what is at issue in this litigation.

To the extent the Court were to find that title passes from, for example, the pool to the Protocol to one of the Plaintiffs, this split-second, autonomous function would make the Protocol collateral to the transaction. *See Longfin*, 2019 WL 1569792, at *6 ("[u]nder Section 12(a)(1), the 'buyer does not, in any meaningful sense, "purchas[e]" the security from … participants only remotely related to the relevant aspects of the sales transactions'" (quoting *Pinter*, 486 U.S. at 651)); *Wilson* v. *Saintine Expl. & Drilling Corp.*, 872 F.2d 1124, 1125 (2d Cir. 1989) ("[C]ollateral participants who do not solicit sales cannot be liable

under Section 12(1)[.]").[16]  Any such passage of title would thus be an insufficient predicate for Section 12 liability.

### b.    Plaintiffs' Solicitation Theory Fails

Perhaps as a last resort, Plaintiffs allege that Defendants sold, promoted, and/or solicited the Tokens directly to Plaintiffs for purposes of increasing the value of their UNI governance tokens.  (FAC ¶¶ 195, 197-198, 735; Pl. Opp. 30).  However, in order to adequately allege solicitation, Plaintiffs must show that Defendants "successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve [their] own financial interests or those of the securities' owner."  *Pinter*, 486 U.S. at 647.  *First*, and fatal to their claims, Plaintiffs offer nothing more than a conclusory allegation that Defendants "sold, promoted, and/or solicited the Tokens directly to Plaintiffs and the Class members."  (FAC ¶ 735).  *Second*, and independently fatal, there is no allegation that the alleged solicitation was successful.  *See Holsworth* v. *BProtocol Fund*, No. 20 Civ. 2810 (AKH), 2021 WL 706549, at *3 (S.D.N.Y. Feb. 22, 2021) (rejecting solicitation claim where plaintiff had not "shown that

---

[16]      And while Plaintiffs seek support in *Underwood*, the Court finds it inapposite.  There, Coinbase, a centralized platform, allowed users to hold their tokens in a Coinbase Wallet, where Coinbase potentially remained in control of that users' funds. *Underwood*, 2023 WL 1431965, at *6.  Here, as Plaintiffs themselves describe, the only wallets are users' own — they connect them to the Protocol pursuant to the more recent Interface agreement, and only allow Uniswap to access the funds when the user is ready to complete the swap or, stated differently, to check out.  This is plainly distinguishable from *Underwood* which, in any event, did not make a legal finding due to those plaintiffs' poor pleading.  *Id.* at *6-7.  Furthermore, the plaintiffs in *Underwood* alleged that customers transacted solely with Coinbase because it used a single centralized wallet that Coinbase controlled, theorizing that Coinbase was thus a seller of the tokens at issue.  *Id.* at *6.  Here, Labs is a mere developer of the smart contracts, and the VC Defendants are merely alleged to be liquidity providers.  There is no allegation that Plaintiffs transacted with Labs or with the VC Defendants themselves, or that the Protocol or any Defendant ever maintained control of Plaintiffs' crypto wallets.

he was directly contacted by [d]efendants or that he purchased securities as a
result of any active solicitations by [d]efendants"); *Emps.' Ret. Sys. of the Gov't
of the Virgin Islands* v. *J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 151
(S.D.N.Y. 2011) (dismissing Section 12 claim that relied on conclusory
allegations, and distinguishing plaintiff's case from one involving an allegation
of successful solicitation); *see also Capri* v. *Murphy*, 856 F.2d 473, 478-79 (2d
Cir. 1988) (noting that solicitation allegations must establish that particular
defendant "actually solicited [plaintiffs'] investment").

Plaintiffs hang their hats on two tweets from Adams suggesting that the
Protocol was "secure" and "for many people" to serve as the basis for their
solicitation argument. (FAC ¶ 53; Pl. Opp. 30 & n.18 ("Defendants solicited
Plaintiffs to purchase fraudulent Tokens on [their] exchange using social media
to convince Plaintiffs that [the Protocol] was safe." (citing FAC ¶¶ 9, 133, 198))).
From this, Plaintiffs reason, Defendants solicited buyers to purchase the
Tokens for their own financial gain. The conduct, however, is too attenuated to
state a claim. After all, no plaintiff would sue the New York Stock Exchange or
NASDAQ for tweeting that its exchange was a safe place to trade after that
plaintiff had lost money due to an issuer's fraudulent schemes. Here too,
Plaintiffs are looking for a scapegoat for their claims because the defendants
they truly seek are unidentifiable. This is evidenced by Plaintiffs' inclusion of
literally hundreds of paragraphs of solicitation claims directed at parties other
than Defendants. (*See, e.g.*, FAC ¶¶ 397-398 ("The issuers made
misstatements about decentralization in the Kishu Inu whitepaper to induce

inexperienced retail investors to invest in the token to inflate the price … [and they] profited handsomely by pumping the price of the token, selling their holdings and pulling their Liquidity Tokens out of the liquidity pool for the token."); *id.* ¶ 447 (same regarding VERA issuers); *id.* ¶¶ 550-553 (same regarding ARES issuers)).

Whether this anonymity is troublesome enough to merit regulation is not for the Court to decide, but for Congress.  Indeed, "[t]he ultimate question [in these cases] is one of congressional intent, not one of whether this Court thinks it can improve upon the statutory scheme that Congress enacted into law." *Pinter*, 486 U.S. at 653 (quoting *Touche Ross & Co.* v. *Redington*, 442 U.S. 560, 578 (1979)); *see id.* ("The broad remedial goals of the Securities Act are insufficient justification for interpreting a specific provision "'more broadly than its language and the statutory scheme reasonably permit.'" (first quoting *Touche Ross*, 442 U.S. at 578, then quoting *SEC* v. *Sloan*, 436 U.S. 103, 116 (1978))).  There is simply no intellectually honest way to read Section 12(a)(1) in a manner that allows the Court to reach Plaintiffs' requested outcome.  *See In re OPUS360 Sec. Litig.*, No. 01 Civ. 2938 (JGK) (JCF), 2002 WL 31190157, at *11 (S.D.N.Y. Oct. 2, 2002) (dismissing Section 12(a)(2) claims because plaintiffs failed to allege that defendants actually solicited the shares that they purchased).

47

Regarding the financial interest component, Plaintiffs appear to abandon their theory that Labs collected fees for its own financial gain.[17]  Instead, they assert that "Defendants collected transaction fees from Plaintiffs for the issuers of these Scam Tokens and ultimately profited themselves by, at the least, increasing the value of UNI."  (Pl. Opp. 30 (citing FAC ¶ 125)).  Plaintiffs' citation to SEC Chair Gensler's conclusory statement that "[t]here's some incentive structure for those promoters and sponsors in the middle of" the decentralized software, cannot support a claim that Defendants had a financial interest in the particular transactions at issue here.  (*See* Pl. Opp. 28 (quoting Serritella Decl., Ex. H)).  Instead, Plaintiffs' allegations that Labs either directly solicited the transactions or did so as a means of obtaining a profit are entirely conclusory and devoid of factual support.  And even if those allegations were adequate, Plaintiffs still fail to allege the first two elements.  Accordingly, Defendants' motions to dismiss both sets of primary federal securities claims are granted.

### 4.    Plaintiffs Have Not Alleged Control Person Liability

Plaintiffs separately allege control person liability claims as to Adams and the VC Defendants: one under Section 20(a) of the Exchange Act, one under Section 15 of the Securities Act.  (FAC ¶¶ 725-730, 741-745; Pl. Opp. 31-38).  To state a claim for control person liability under Section 20(a) of

---

[17]    In the FAC, Plaintiffs assert that Labs charges fees to users of the Protocol and distributes the fees to liquidity providers in the amount of thirty basis points per trade. (*See, e.g.*, FAC ¶¶ 91-92; v2 Whitepaper 1).  As noted earlier and as acknowledged by Plaintiffs (*see* Pl. Opp. 9-10), while Labs has the option pursuant to v2 of the Protocol to turn on a switch to allow a portion of liquidity provider fees to be released to Labs itself, that switch has not been turned on.

the Exchange Act, "a plaintiff must show [i] a primary violation by the controlled person, [ii] control of the primary violator by the defendant, and [iii] that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (internal quotation marks omitted).  The same is true under the Securities Act.  *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 660 (S.D.N.Y. 2007) ("Section 20(a) and Section 15 are parallel provisions, and their terms are interpreted in the same manner." (internal quotation marks omitted)).  Having concluded that Plaintiffs here fail to state primary violations of the federal securities laws, the Court dismisses as well Plaintiffs' control person claims.  *See Wilson* v. *Merrill Lynch & Co.*, 671 F.3d 120, 139 (2d Cir. 2011) (affirming dismissal of Section 20(a) claim where plaintiff failed to allege a primary violation).

## C.    Plaintiff's State Law Claims

Finally, Defendants move to dismiss Plaintiffs' various state law claims — namely, securities violations claims arising under Idaho and North Carolina blue sky laws (FAC ¶¶ 746-793), and aiding and abetting fraud, aiding and abetting negligent misrepresentation, and unjust enrichment claims under New York law (*id.* ¶¶ 794-814; Pl. Opp. 42-48 (specifying New York law)).   As a general matter, where federal claims are dismissed before trial, "even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *First Cap. Asset Mgmt., Inc.* v. *Satinwood, Inc.*, 385 F.3d 159, 183 (2d Cir. 2004) (quoting *Castellano* v. *Bd. of Trustees*, 937 F.2d 752,

758 (2d Cir. 1991)); *United Mine Workers of Am.* v. *Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, … the state claims should be dismissed as well.").  Here, no circumstances counsel in favor of the Court's exercising supplemental jurisdiction over Plaintiffs' state law claims, and factors of convenience, fairness, and comity do not require the Court to exercise supplemental jurisdiction.  Accordingly, the Court declines to exercise its supplemental jurisdiction over the state law claims and dismisses them without prejudice.[18]

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are GRANTED. In particular, the Court dismisses Plaintiffs' federal claims with prejudice, and dismisses Plaintiffs' state-law claims without prejudice to their refiling in state court.[19]  Because the Court dismisses the action, it declines to certify the class.

---

[18]  Finally, Plaintiffs bring suit against the Foundation, alleging that it is an alter ego of Labs, and therefore shares liability under each cause of action.  (*See, e.g.*, FAC ¶¶ 714, 724, 740).  For support, Plaintiffs note that the Foundation has overlapping control and shares a common purpose with Labs.  (*Id.* ¶ 20).  Because the Court dismisses the FAC as to Labs, it need not reach the issue of alter ego liability as to the Foundation. Furthermore, the Court declines to reach the timeliness arguments that Defendants raise as to certain Token transactions, having concluded that Plaintiffs' claims fail on the merits.

[19]  The Court does not consider whether to grant Plaintiffs leave to amend because they have not requested to do so.  *See Gallop* v. *Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) ("[N]o court can be said to have erred in failing to grant a request [to amend] that was not made."); *Sussman Sales Co.* v. *VWR Int'l, LLC*, No. 20 Civ. 2869 (KPF), 2021 WL 1165077, at *21 (S.D.N.Y. Mar. 26, 2021) (dismissing with prejudice where plaintiff did not seek leave to amend in connection with motion to dismiss and declined to amend after receiving defendant's pre-motion letter).  Nonetheless, amendment would be futile for the reasons stated above.

The Clerk of Court is instructed to terminate all pending motions,

adjourn all remaining deadlines, and close this case.

SO ORDERED.

Dated:      August 29, 2023
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

51